## GREGORY ET AL., JUDGES v. ASHCROFT, GOVERNOR OF MISSOURI

No. 90–50.   Argued March 18, 1991—Decided June 20, 1991

*Jim J. Shoemake* argued the cause for petitioners. With him on the briefs were *Thomas J. Guilfoil* and *Bruce Dayton Livingston*.

*James B. Deutsch*, Deputy Attorney General of Missouri, argued the cause for respondent. With him on the brief were *William L. Webster*, Attorney General, and *Michael L. Boicourt*, Assistant Attorney General.*

---

*\*Cathy Ventrell-Monsees* filed a brief for the American Association of Retired Persons as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Colorado et al. by *Scott Harshbarger*, Attorney General of Massachusetts, *H. Reed Witherby*, Special Assistant Attorney General, and *Thomas A. Barnico*, Assistant Attorney General, and by the Attorneys General for their

JUSTICE O'CONNOR delivered the opinion of the Court.

Article V, § 26, of the Missouri Constitution provides that "[a]ll judges other than municipal judges shall retire at the age of seventy years." We consider whether this mandatory retirement provision violates the federal Age Discrimination in Employment Act of 1967 (ADEA or Act), 81 Stat. 602, as amended, 29 U. S. C. §§ 621–634, and whether it comports with the federal constitutional prescription of equal protection of the laws.

I

Petitioners are Missouri state judges. Judge Ellis Gregory, Jr., is an associate circuit judge for the Twenty-first Judicial Circuit. Judge Anthony P. Nugent, Jr., is a judge of the Missouri Court of Appeals, Western District. Both are subject to the § 26 mandatory retirement provision. Petitioners were appointed to office by the Governor of Missouri, pursuant to the Missouri Non-Partisan Court Plan, Mo. Const., Art. V, §§ 25(a)–25(g). Each has, since his appointment, been retained in office by means of a retention election in which the judge ran unopposed, subject only to a "yes or no" vote. See Mo. Const., Art. V, § 25(c)(1).

respective jurisdictions as follows: *Gale A. Norton* of Colorado, *Robert A. Butterworth* of Florida, *Warren Price III* of Hawaii, *Hubert H. Humphrey III* of Minnesota, *Donald Stenberg* of Nebraska, *Robert Del Tufo* of New Jersey, *Nicholas J. Spaeth* of North Dakota, *Ernest D. Preate, Jr.,* of Pennsylvania, *Hector Rivera-Cruz* of Puerto Rico, *James E. O'Neil* of Rhode Island, *T. Travis Medlock* of South Carolina, and *Joseph B. Meyer* of Wyoming; for the State of Connecticut by *Richard Blumenthal,* Attorney General, and *Arnold B. Feigin* and *Daniel R. Schaefer,* Assistant Attorneys General; for the State of Vermont, Office of Court Administrator, by *William B. Gray;* for the Missouri Bar by *Karen M. Iverson* and *Timothy K. McNamara;* for the National Governors Association et al. by *Richard Ruda, Michael J. Wahoske,* and *Mark B. Rotenberg;* and for the Washington Legal Foundation by *John C. Cozad, W. Dennis Cross, R. Christopher Abele, Daniel J. Popeo,* and *John C. Scully.*

*Daniel G. Spraul* filed a brief for Judge John W. Keefe as *amicus curiae.*

Petitioners and two other state judges filed suit against John D. Ashcroft, the Governor of Missouri, in the United States District Court for the Eastern District of Missouri, challenging the validity of the mandatory retirement provision. The judges alleged that the provision violated both the ADEA and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Governor filed a motion to dismiss.

The District Court granted the motion, holding that Missouri's appointed judges are not protected by the ADEA because they are "appointees . . . 'on a policymaking level'" and therefore are excluded from the Act's definition of "employee." App. to Pet. for Cert. 22. The court held also that the mandatory retirement provision does not violate the Equal Protection Clause because there is a rational basis for the distinction between judges and other state officials to whom no mandatory retirement age applies. *Id.*, at 23.

The United States Court of Appeals for the Eighth Circuit affirmed the dismissal. 898 F. 2d 598 (1990). That court also held that appointed judges are "'appointee[s] on the policymaking level,'" and are therefore not covered under the ADEA. *Id.*, at 604. The Court of Appeals held as well that Missouri had a rational basis for distinguishing judges who had reached the age of 70 from those who had not. *Id.*, at 606.

We granted certiorari on both the ADEA and equal protection questions, 498 U. S. 979 (1990), and now affirm.

## II

The ADEA makes it unlawful for an "employer" "to discharge any individual" who is at least 40 years old "because of such individual's age." 29 U. S. C. §§ 623(a), 631(a). The term "employer" is defined to include "a State or political subdivision of a State." § 630(b)(2). Petitioners work for the State of Missouri. They contend that the Missouri

mandatory retirement requirement for judges violates the ADEA.

A

As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government. This Court also has recognized this fundamental principle. In *Tafflin* v. *Levitt*, 493 U. S. 455, 458 (1990), "[w]e beg[a]n with the axiom that, under our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." Over 120 years ago, the Court described the constitutional scheme of dual sovereigns:

> "'[T]he people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence,' . . . '[W]ithout the States in union, there could be no such political body as the United States.' Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." *Texas* v. *White*, 7 Wall. 700, 725 (1869), quoting *Lane County* v. *Oregon*, 7 Wall. 71, 76 (1869).

The Constitution created a Federal Government of limited powers. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U. S. Const., Amdt. 10. The States thus retain substantial sovereign authority under our constitutional system. As James Madison put it:

> "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite. . . . The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961).

This federalist structure of joint sovereigns preserves to the people numerous advantages. It assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry. See generally McConnell, Federalism: Evaluating the Founders' Design, 54 U. Chi. L. Rev. 1484, 1491–1511 (1987); Merritt, The Guarantee Clause and State Autonomy: Federalism for a Third Century, 88 Colum. L. Rev. 1, 3–10 (1988).

Perhaps the principal benefit of the federalist system is a check on abuses of government power. "The 'constitutionally mandated balance of power' between the States and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties.'" *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 242 (1985), quoting *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 572 (1985) (Powell, J., dissenting). Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front. Alexander Hamilton explained to the people of New York, perhaps optimistically, that the new federalist system would

suppress completely "the attempts of the government to establish a tyranny":

> "[I]n a confederacy the people, without exaggeration, may be said to be entirely the masters of their own fate. Power being almost always the rival of power, the general government will at all times stand ready to check the usurpations of the state governments, and these will have the same disposition towards the general government. The people, by throwing themselves into either scale, will infallibly make it preponderate. If their rights are invaded by either, they can make use of the other as the instrument of redress." The Federalist No. 28, pp. 180–181 (C. Rossiter ed. 1961).

James Madison made much the same point:

> "In a single republic, all the power surrendered by the people is submitted to the administration of a single government; and the usurpations are guarded against by a division of the government into distinct and separate departments. In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself." *Id.*, No. 51, p. 323.

One fairly can dispute whether our federalist system has been quite as successful in checking government abuse as Hamilton promised, but there is no doubt about the design. If this "double security" is to be effective, there must be a proper balance between the States and the Federal Government. These twin powers will act as mutual restraints only if both are credible. In the tension between federal and state power lies the promise of liberty.

The Federal Government holds a decided advantage in this delicate balance: the Supremacy Clause. U. S. Const., Art. VI, cl. 2. As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States. Congress may legislate in areas traditionally regulated by the States. This is an extraordinary power in a federalist system. It is a power that we must assume Congress does not exercise lightly.

The present case concerns a state constitutional provision through which the people of Missouri establish a qualification for those who sit as their judges. This provision goes beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a sovereign entity. Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign. "It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers . . . should be exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States." *Taylor* v. *Beckham*, 178 U. S. 548, 570–571 (1900). See also *Boyd* v. *Nebraska ex rel. Thayer*, 143 U. S. 135, 161 (1892) ("Each State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen").

Congressional interference with this decision of the people of Missouri, defining their constitutional officers, would upset the usual constitutional balance of federal and state powers. For this reason, "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" this balance. *Atascadero, supra,* at 243. We explained recently:

"[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.' *Atascadero*

> *State Hospital* v. *Scanlon*, 473 U. S. 234, 242 (1985);
> see also *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 99 (1984). *Atascadero* was an Eleventh Amendment case, but a similar approach is applied in other contexts. Congress should make its intention 'clear and manifest' if it intends to pre-empt the historic powers of the States, *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947) . . . . 'In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.' *United States* v. *Bass*, 404 U. S. 336, 349 (1971)." *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 65 (1989).

This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.

In a recent line of authority, we have acknowledged the unique nature of state decisions that "go to the heart of representative government." *Sugarman* v. *Dougall*, 413 U. S. 634, 647 (1973). *Sugarman* was the first in a series of cases to consider the restrictions imposed by the Equal Protection Clause of the Fourteenth Amendment on the ability of state and local governments to prohibit aliens from public employment. In that case, the Court struck down under the Equal Protection Clause a New York City law that provided a flat ban against the employment of aliens in a wide variety of city jobs. *Ibid.*

The Court did not hold, however, that alienage could never justify exclusion from public employment. We recognized explicitly the States' constitutional power to establish the qualifications for those who would govern:

> "Just as 'the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth

Amendment, the power to regulate elections,' *Oregon* v. *Mitchell*, 400 U. S. 112, 124–125 (1970) (footnote omitted) (opinion of Black, J.); see *id.*, at 201 (opinion of Harlan, J.), and *id.*, at 293–294 (opinion of STEWART, J.), "[e]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." *Boyd* v. *Thayer*, 143 U. S. 135, 161 (1892). See *Luther* v. *Borden*, 7 How. 1, 41 (1849); *Pope* v. *Williams*, 193 U. S. 621, 632–633 (1904). Such power inheres in the State by virtue of its obligation, already noted above, 'to preserve the basic conception of a political community.' *Dunn* v. *Blumstein*, 405 U. S. [330, 344 (1972)]. And this power and responsibility of the State applies, not only to the qualifications of voters, but also to persons holding state elective and important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government." *Ibid.*

We explained that, while the Equal Protection Clause provides a check on such state authority, "our scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives." *Id.*, at 648. This rule "is no more than . . . a recognition of a State's constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders. U. S. Const. Art. IV, § 4; U. S. Const. Amdt. X; *Luther* v. *Borden*, *supra*; see *In re Duncan*, 139 U. S. 449, 461 (1891)." *Ibid.*

In several subsequent cases we have applied the "political function" exception to laws through which States exclude aliens from positions "intimately related to the process of democratic self-government." See *Bernal* v. *Fainter*, 467 U. S. 216, 220 (1984). See also *Nyquist* v. *Mauclet*, 432 U. S. 1, 11 (1977); *Foley* v. *Connelie*, 435 U. S. 291, 295–296

(1978); *Ambach* v. *Norwick*, 441 U. S. 68, 73–74 (1979); *Cabell* v. *Chavez-Salido*, 454 U. S. 432, 439–441 (1982). "We have . . . lowered our standard of review when evaluating the validity of exclusions that entrust only to citizens important elective and nonelective positions whose operations 'go to the heart of representative government.'" *Bernal*, 467 U. S., at 221 (citations omitted).

These cases stand in recognition of the authority of the people of the States to determine the qualifications of their most important government officials.* It is an authority that lies at "'the heart of representative government.'" *Ibid.* It is a power reserved to the States under the Tenth Amendment and guaranteed them by that provision of the Constitution under which the United States "guarantee[s] to every State in this Union a Republican Form of Government." U. S. Const., Art. IV, § 4. See *Sugarman, supra,* at 648 (citing the Guarantee Clause and the Tenth Amendment). See also Merritt, 88 Colum. L. Rev., at 50–55.

The authority of the people of the States to determine the qualifications of their government officials is, of course, not without limit. Other constitutional provisions, most notably the Fourteenth Amendment, proscribe certain qualifications; our review of citizenship requirements under the political function exception is less exacting, but it is not absent.

---

*JUSTICE WHITE believes that the "political function" cases are inapposite because they involve limitations on *"judicially created* scrutiny" rather than *"Congress'* legislative authority," which is at issue here. *Post,* at 477. He apparently suggests that Congress has greater authority to interfere with state sovereignty when acting pursuant to its Commerce Clause powers than this Court does when applying the Fourteenth Amendment. Elsewhere in his opinion, JUSTICE WHITE emphasizes that the Fourteenth Amendment was designed as an intrusion on state sovereignty. See *post,* at 480. That being the case, our diminished scrutiny of state laws in the "political function" cases, brought under the Fourteenth Amendment, argues strongly for special care when interpreting alleged congressional intrusions into state sovereignty under the Commerce Clause.

Here, we must decide what Congress did in extending the ADEA to the States, pursuant to its powers under the Commerce Clause. See *EEOC* v. *Wyoming*, 460 U. S. 226 (1983) (the extension of the ADEA to employment by state and local governments was a valid exercise of Congress' powers under the Commerce Clause). As against Congress' powers "[t]o regulate Commerce . . . among the several States," U. S. Const., Art. I, § 8, cl. 3, the authority of the people of the States to determine the qualifications of their government officials may be inviolate.

We are constrained in our ability to consider the limits that the state-federal balance places on Congress' powers under the Commerce Clause. See *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985) (declining to review limitations placed on Congress' Commerce Clause powers by our federal system). But there is no need to do so if we hold that the ADEA does not apply to state judges. Application of the plain statement rule thus may avoid a potential constitutional problem. Indeed, inasmuch as this Court in *Garcia* has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers, we must be absolutely certain that Congress intended such an exercise. "[T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests." L. Tribe, American Constitutional Law § 6–25, p. 480 (2d ed. 1988).

B

In 1974, Congress extended the substantive provisions of the ADEA to include the States as employers. Pub. L. 93–259, § 28(a), 88 Stat. 74, 29 U. S. C. § 630(b)(2). At the same time, Congress amended the definition of "employee" to exclude all elected and most high-ranking government officials. Under the Act, as amended:

> "The term 'employee' means an individual employed by any employer except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office." 29 U. S. C. § 630(f).

Governor Ashcroft contends that the § 630(f) exclusion of certain public officials also excludes judges, like petitioners, who are appointed to office by the Governor and are then subject to retention election. The Governor points to two passages in § 630(f). First, he argues, these judges are selected by an elected official and, because they make policy, are "appointee[s] on the policymaking level."

Petitioners counter that judges merely resolve factual disputes and decide questions of law; they do not make policy. Moreover, petitioners point out that the policymaking-level exception is part of a trilogy, tied closely to the elected-official exception. Thus, the Act excepts elected officials and: (1) "any person chosen by such officer to be on such officer's personal staff"; (2) "an appointee on the policymaking level"; and (3) "an immediate advisor with respect to the exercise of the constitutional or legal powers of the office." Applying the maxim of statutory construction *noscitur a sociis*—that a word is known by the company it keeps—petitioners argue that since (1) and (3) refer only to those in close working relationships with elected officials, so too must (2). Even if it can be said that judges may make policy, petitioners contend, they do not do so at the behest of an elected official.

Governor Ashcroft relies on the plain language of the statute: It exempts persons appointed "at the policymaking level." The Governor argues that state judges, in fashioning and applying the common law, make policy. Missouri is a

common law state. See Mo. Rev. Stat. § 1.010 (1986) (adopting "[t]he common law of England" consistent with federal and state law). The common law, unlike a constitution or statute, provides no definitive text; it is to be derived from the interstices of prior opinions and a well-considered judgment of what is best for the community. As Justice Holmes put it:

> "The very considerations which judges most rarely mention, and always with an apology, are the secret root from which the law draws all the juices of life. I mean, of course, considerations of what is expedient for the community concerned. Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy; most generally, to be sure, under our practice and traditions, the unconscious result of instinctive preferences and inarticulate convictions, but nonetheless traceable to views of public policy in the last analysis."
>
> O. Holmes, The Common Law 35–36 (1881).

Governor Ashcroft contends that Missouri judges make policy in other ways as well. The Missouri Supreme Court and Courts of Appeals have supervisory authority over inferior courts. Mo. Const., Art. V, § 4. The Missouri Supreme Court has the constitutional duty to establish rules of practice and procedure for the Missouri court system, and inferior courts exercise policy judgment in establishing local rules of practice. See Mo. Const., Art. V, § 5. The state courts have supervisory powers over the state bar, with the Missouri Supreme Court given the authority to develop disciplinary rules. See Mo. Rev. Stat. §§ 484.040, 484.200–484.270 (1986); Rules Governing the Missouri Bar and the Judiciary (1991).

The Governor stresses judges' policymaking responsibilities, but it is far from plain that the statutory exception requires that judges actually make policy. The statute refers to appointees "on the policymaking level," not to appointees "who make policy." It may be sufficient that the ap-

pointee is in a position requiring the exercise of discretion concerning issues of public importance. This certainly describes the bench, regardless of whether judges might be considered policymakers in the same sense as the executive or legislature.

Nonetheless, "appointee at the policymaking level," particularly in the context of the other exceptions that surround it, is an odd way for Congress to exclude judges; a plain statement that judges are not "employees" would seem the most efficient phrasing. But in this case we are not looking for a plain statement that judges are excluded. We will not read the ADEA to cover state judges unless Congress has made it clear that judges are *included.* This does not mean that the Act must mention judges explicitly, though it does not. Cf. *Dellmuth* v. *Muth,* 491 U. S. 223, 233 (1989) (SCALIA, J., concurring). Rather, it must be plain to anyone reading the Act that it covers judges. In the context of a statute that plainly excludes most important state public officials, "appointee on the policymaking level" is sufficiently broad that we cannot conclude that the statute plainly covers appointed state judges. Therefore, it does not.

The ADEA plainly covers all state employees except those excluded by one of the exceptions. Where it is unambiguous that an employee does not fall within one of the exceptions, the Act states plainly and unequivocally that the employee is included. It is at least ambiguous whether a state judge is an "appointee on the policymaking level."

Governor Ashcroft points also to the "person elected to public office" exception. He contends that because petitioners—although appointed to office initially—are subject to retention election, they are "elected to public office" under the ADEA. Because we conclude that petitioners fall presumptively under the policymaking-level exception, we need not answer this question.

C

The extension of the ADEA to employment by state and local governments was a valid exercise of Congress' pow-

ers under the Commerce Clause. *EEOC* v. *Wyoming*, 460 U. S. 226 (1983). In *Wyoming*, we reserved the questions whether Congress might also have passed the ADEA extension pursuant to its powers under § 5 of the Fourteenth Amendment, and whether the extension would have been a valid exercise of that power. *Id.*, at 243, and n. 18. We noted, however, that the principles of federalism that constrain Congress' exercise of its Commerce Clause powers are attenuated when Congress acts pursuant to its powers to enforce the Civil War Amendments. *Id.*, at 243, and n. 18, citing *City of Rome* v. *United States*, 446 U. S. 156, 179 (1980). This is because those "Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty." *Id.*, at 179. One might argue, therefore, that if Congress passed the ADEA extension under its § 5 powers, the concerns about federal intrusion into state government that compel the result in this case might carry less weight.

By its terms, the Fourteenth Amendment contemplates interference with state authority: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14. But this Court has never held that the Amendment may be applied in complete disregard for a State's constitutional powers. Rather, the Court has recognized that the States' power to define the qualifications of their officeholders has force even as against the proscriptions of the Fourteenth Amendment.

We return to the political-function cases. In *Sugarman*, the Court noted that "aliens as a class 'are a prime example of a "discrete and insular" minority (see *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152–153, n. 4 (1938)),' and that classifications based on alienage are 'subject to close judicial scrutiny.'" 413 U. S., at 642, quoting *Graham* v. *Richardson*, 403 U. S. 365, 372 (1971). The *Sugarman* Court held that New York City had insufficient interest in preventing aliens from holding a broad category of public

jobs to justify the blanket prohibition. 413 U. S., at 647. At the same time, the Court established the rule that scrutiny under the Equal Protection Clause "will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives." *Id.*, at 648. Later cases have reaffirmed this practice. See *Foley* v. *Connelie*, 435 U. S. 291 (1978); *Ambach* v. *Norwick*, 441 U. S. 68 (1979); *Cabell* v. *Chavez-Salido*, 454 U. S. 432 (1982). These cases demonstrate that the Fourteenth Amendment does not override all principles of federalism.

Of particular relevance here is *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981). The question in that case was whether Congress, in passing a section of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. § 6010 (1982 ed.), intended to place an obligation on the States to provide certain kinds of treatment to the disabled. Respondent Halderman argued that Congress passed § 6010 pursuant to § 5 of the Fourteenth Amendment, and therefore that it was mandatory on the States, regardless of whether they received federal funds. Petitioner and the United States, as respondent, argued that, in passing § 6010, Congress acted pursuant to its spending power alone. Consequently, § 6010 applied only to States accepting federal funds under the Act.

The Court was required to consider the "appropriate test for determining when Congress intends to enforce" the guarantees of the Fourteenth Amendment. 451 U. S., at 16. We adopted a rule fully cognizant of the traditional power of the States: "Because such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Ibid.* Because Congress nowhere stated its intent to impose mandatory obligations on the States under its § 5 powers, we concluded that Congress did not do so. *Ibid.*

The *Pennhurst* rule looks much like the plain statement rule we apply today. In *EEOC* v. *Wyoming,* the Court explained that *Pennhurst* established a rule of statutory construction to be applied where statutory intent is ambiguous. 460 U. S., at 244, n. 18. In light of the ADEA's clear exclusion of most important public officials, it is at least ambiguous whether Congress intended that appointed judges nonetheless be included. In the face of such ambiguity, we will not attribute to Congress an intent to intrude on state governmental functions regardless of whether Congress acted pursuant to its Commerce Clause powers or § 5 of the Fourteenth Amendment.

## III

Petitioners argue that, even if they are not covered by the ADEA, the Missouri Constitution's mandatory retirement provision for judges violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Petitioners contend that there is no rational basis for the decision of the people of Missouri to preclude those aged 70 and over from serving as their judges. They claim that the mandatory retirement provision makes two irrational distinctions: between judges who have reached age 70 and younger judges, and between judges 70 and over and other state employees of the same age who are not subject to mandatory retirement.

Petitioners are correct to assert their challenge at the level of rational basis. This Court has said repeatedly that age is not a suspect classification under the Equal Protection Clause. See *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 313–314 (1976); *Vance* v. *Bradley,* 440 U. S. 93, 97 (1979); *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 441 (1985). Nor do petitioners claim that they have a fundamental interest in serving as judges. The State need therefore assert only a rational basis for its age classification. See *Murgia, supra,* at 314; *Bradley,* 440 U. S., at 97. In cases where a classification burdens neither a suspect

group nor a fundamental interest, "courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws." *Ibid.* In this case, we are dealing not merely with government action, but with a state constitutional provision approved by the people of Missouri as a whole. This constitutional provision reflects both the considered judgment of the state legislature that proposed it and that of the citizens of Missouri who voted for it. See 1976 Mo. Laws 812 (proposing the mandatory retirement provision of § 26); Mo. Const., Art. XII, §§ 2(a), 2(b) (describing the amendment process). "[W]e will not overturn such a [law] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [people's] actions were irrational." *Bradley, supra,* at 97. See also *Pennell* v. *San Jose,* 485 U. S. 1, 14 (1988).

Governor Ashcroft cites *O'Neil* v. *Baine,* 568 S. W. 2d 761 (Mo. 1978) (en banc), as a fruitful source of rational bases. In *O'Neil,* the Missouri Supreme Court—to whom Missouri Constitution Article V, § 26, applies—considered an equal protection challenge to a state statute that established a mandatory retirement age of 70 for state magistrate and probate judges. The court upheld the statute, declaring numerous legitimate state objectives it served: "The statute draws a line at a certain age which attempts to uphold the high competency for judicial posts and which fulfills a societal demand for the highest caliber of judges in the system"; "the statute . . . draws a legitimate line to avoid the tedious and often perplexing decisions to determine which judges after a certain age are physically and mentally qualified and those who are not"; "mandatory retirement increases the opportunity for qualified persons . . . to share in the judiciary and permits an orderly attrition through retirement"; "such a mandatory provision also assures predictability and ease in establishing and administering judges' pension plans." *Id.,* at 766–767. Any one of these explanations is sufficient to rebut the claim

that "the varying treatment of different groups or persons [in §26] is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [people's] actions were irrational." *Bradley, supra,* at 97.

The people of Missouri have a legitimate, indeed compelling, interest in maintaining a judiciary fully capable of performing the demanding tasks that judges must perform. It is an unfortunate fact of life that physical and mental capacity sometimes diminish with age. See *Bradley, supra,* at 111–112; *Murgia, supra,* at 315. The people may therefore wish to replace some older judges. Voluntary retirement will not always be sufficient. Nor may impeachment—with its public humiliation and elaborate procedural machinery—serve acceptably the goal of a fully functioning judiciary. See Mo. Const., Art. VII, §§ 1–3.

The election process may also be inadequate. Whereas the electorate would be expected to discover if their governor or state legislator were not performing adequately and vote the official out of office, the same may not be true of judges. Most voters never observe state judges in action, nor read judicial opinions. State judges also serve longer terms of office than other public officials, making them—deliberately—less dependent on the will of the people. Compare Mo. Const., Art. V, § 19 (Supreme Court justices and Court of Appeals judges serve 12-year terms; Circuit Court judges 6 years), with Mo. Const., Art. IV, § 17 (Governor, Lieutenant Governor, secretary of state, state treasurer, and attorney general serve 4-year terms) and Mo. Const., Art. III, § 11 (state representatives serve 2-year terms; state senators 4 years). Most of these judges do not run in ordinary elections. See Mo. Const., Art. V, § 25(a). The people of Missouri rationally could conclude that retention elections—in which state judges run unopposed at relatively long intervals—do not serve as an adequate check on judges whose performance is deficient. Mandatory retirement is a reasonable response to this dilemma.

This is also a rational explanation for the fact that state judges are subject to a mandatory retirement provision, while other state officials—whose performance is subject to greater public scrutiny, and who are subject to more standard elections—are not. Judges' general lack of accountability explains also the distinction between judges and other state employees, in whom a deterioration in performance is more readily discernible and who are more easily removed.

The Missouri mandatory retirement provision, like all legal classifications, is founded on a generalization. It is far from true that all judges suffer significant deterioration in performance at age 70. It is probably not true that most do. It may not be true at all. But a State "'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.'" *Murgia*, 427 U. S., at 316, quoting *Dandridge* v. *Williams*, 397 U. S. 471, 485 (1970). "In an equal protection case of this type . . . those challenging the . . . judgment [of the people] must convince the court that the . . . facts on which the classification is apparently based could not reasonably be conceived to be true by the . . . decisionmaker." *Bradley*, 440 U. S., at 111. The people of Missouri rationally could conclude that the threat of deterioration at age 70 is sufficiently great, and the alternatives for removal sufficiently inadequate, that they will require all judges to step aside at age 70. This classification does not violate the Equal Protection Clause.

IV

The people of Missouri have established a qualification for those who would be their judges. It is their prerogative as citizens of a sovereign State to do so. Neither the ADEA nor the Equal Protection Clause prohibits the choice they have made. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE WHITE, with whom JUSTICE STEVENS joins, concurring in part, dissenting in part, and concurring in the judgment.

I agree with the majority that neither the Age Discrimination in Employment Act of 1967 (ADEA) nor the Equal Protection Clause prohibits Missouri's mandatory retirement provision as applied to petitioners, and I therefore concur in the judgment and in Parts I and III of the majority's opinion. I cannot agree, however, with the majority's reasoning in Part II of its opinion, which ignores several areas of well-established precedent and announces a rule that is likely to prove both unwise and infeasible. That the majority's analysis in Part II is completely unnecessary to the proper resolution of this case makes it all the more remarkable.

I

In addition to petitioners' equal protection claim, we granted certiorari to decide the following question:

> "Whether appointed Missouri state court judges are 'appointee[s] on the policymaking level' within the meaning of the Age Discrimination in Employment Act ('ADEA'), 28 U. S. C. §§ 621–34 (1982 & Supp. V 1987), and therefore exempted from the ADEA's general prohibition of mandatory retirement and thus subject to the mandatory retirement provision of Article V, Section 26 of the Missouri Constitution." Pet. for Cert. i.

The majority, however, chooses not to resolve that issue of statutory construction. Instead, it holds that whether or not the ADEA can fairly be read to exclude state judges from its scope, "[w]e will not read the ADEA to cover state judges unless Congress has made it clear that judges are *included*." *Ante*, at 467 (emphasis in original). I cannot agree with this "plain statement" rule because it is unsupported by the decisions upon which the majority relies, contrary to our Tenth Amendment jurisprudence, and fundamentally unsound.

Among other things, the ADEA makes it "unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U. S. C. § 623(a). In 1974, Congress amended the definition of "employer" in the ADEA to include "a State or political subdivision of a State." § 630(b)(2). With that amendment, "there is no doubt what the intent of Congress was: to extend the application of the ADEA to the States." *EEOC* v. *Wyoming*, 460 U. S. 226, 244, n. 18 (1983).

The dispute in this case therefore is not whether Congress has outlawed age discrimination by the States. It clearly has. The only question is whether petitioners fall within the definition of "employee" in the Act, § 630(f), which contains exceptions for elected officials and certain appointed officials. If petitioners *are* "employee[s]," Missouri's mandatory retirement provision clearly conflicts with the antidiscrimination provisions of the ADEA. Indeed, we have noted that the "policies and substantive provisions of the [ADEA] apply with especial force in the case of mandatory retirement provisions." *Western Air Lines, Inc.* v. *Criswell*, 472 U. S. 400, 410 (1985). Pre-emption therefore is automatic, since "state law is pre-empted to the extent that it actually conflicts with federal law." *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 204 (1983). The majority's federalism concerns are irrelevant to such "actual conflict" pre-emption. "'The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.'" *Fidelity Federal Sav. & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 153 (1982), quoting *Free* v. *Bland*, 369 U. S. 663, 666 (1962).

While acknowledging this principle of federal legislative supremacy, see *ante*, at 460, the majority nevertheless im-

poses upon Congress a "plain statement" requirement. The majority claims to derive this requirement from the plain statement approach developed in our Eleventh Amendment cases, see, *e. g.*, *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 243 (1985), and applied two Terms ago in *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 65 (1989). The issue in those cases, however, was whether Congress intended a particular statute to extend to the States *at all*. In *Atascadero*, for example, the issue was whether States could be sued under § 504 of the Rehabilitation Act of 1973, 29 U. S. C. § 794. Similarly, the issue in *Will* was whether States could be sued under 42 U. S. C. § 1983. In the present case, by contrast, Congress has expressly extended the coverage of the ADEA to the States and their employees. Its intention to regulate age discrimination by States is thus "unmistakably clear in the language of the statute." *Atascadero, supra*, at 242. See *Davidson* v. *Board of Governors of State Colleges and Universities*, 920 F. 2d 441, 443 (CA7 1990) (ADEA satisfies "clear statement" requirement). The only dispute is over the precise details of the statute's application. We have never extended the plain statement approach that far, and the majority offers no compelling reason for doing so.

The majority also relies heavily on our cases addressing the constitutionality of state exclusion of aliens from public employment. See *ante*, at 461–463, 468–470. In those cases, we held that although restrictions based on alienage ordinarily are subject to strict scrutiny under the Equal Protection Clause, see *Graham* v. *Richardson*, 403 U. S. 365, 372 (1971), the scrutiny will be less demanding for exclusion of aliens "from positions intimately related to the process of democratic self-government." *Bernal* v. *Fainter*, 467 U. S. 216, 220 (1984). This narrow "political-function" exception to the strict-scrutiny standard is based on the "State's historical power to exclude aliens from participation in its

democratic political institutions." *Sugarman* v. *Dougall*, 413 U. S. 634, 648 (1973).

It is difficult to see how the "political-function" exception supports the majority's plain statement rule. First, the exception merely reflects a determination of the scope of the rights of aliens under the Equal Protection Clause. Reduced scrutiny is appropriate for certain political functions because "the right to govern is reserved to citizens." *Foley* v. *Connelie*, 435 U. S. 291, 297 (1978); see also *Sugarman, supra,* at 648–649. This conclusion in no way establishes a method for interpreting rights that are statutorily created by Congress, such as the protection from age discrimination in the ADEA. Second, it is one thing to limit *judicially created* scrutiny, and it is quite another to fashion a restraint on *Congress'* legislative authority, as does the majority; the latter is both counter-majoritarian and an intrusion on a coequal branch of the Federal Government. Finally, the majority does not explicitly restrict its rule to "functions that go to the heart of representative government," 413 U. S., at 647, and may in fact be extending it much further to all "state governmental functions." See *ante,* at 470.

The majority's plain statement rule is not only unprecedented, it directly contravenes our decisions in *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985), and *South Carolina* v. *Baker*, 485 U. S. 505 (1988). In those cases we made it clear "that States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity." *Id.,* at 512. We also rejected as "unsound in principle and unworkable in practice" any test for state immunity that requires a judicial determination of which state activities are "'traditional,'" "'integral,'" or "'necessary.'" *Garcia, supra,* at 546. The majority disregards those decisions in its attempt to carve out areas of state activity that will receive special protection from federal legislation.

The majority's approach is also unsound because it will serve only to confuse the law. First, the majority fails to explain the scope of its rule. Is the rule limited to federal regulation of the qualifications of state officials? See *ante*, at 464. Or does it apply more broadly to the regulation of any "state governmental functions"? See *ante*, at 470. Second, the majority does not explain its requirement that Congress' intent to regulate a particular state activity be "plain to anyone reading [the federal statute]." See *ante*, at 467. Does that mean that it is now improper to look to the purpose or history of a federal statute in determining the scope of the statute's limitations on state activities? If so, the majority's rule is completely inconsistent with our pre-emption jurisprudence. See, *e. g.*, *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 715 (1985) (pre-emption will be found where there is a "'clear and manifest *purpose*'" to displace state law) (emphasis added). The vagueness of the majority's rule undoubtedly will lead States to assert that various federal statutes no longer apply to a wide variety of state activities if Congress has not expressly referred to those activities in the statute. Congress, in turn, will be forced to draft long and detailed lists of which particular state functions it meant to regulate.

The imposition of such a burden on Congress is particularly out of place in the context of the ADEA. Congress already has stated that all "individual[s] employed by any employer" are protected by the ADEA unless they are expressly excluded by one of the exceptions in the definition of "employee." See 29 U. S. C. § 630(f). The majority, however, turns the statute on its head, holding that state judges are not protected by the ADEA because "Congress has [not] made it clear that judges are *included*." *Ante*, at 467 (emphasis in original). Cf. *EEOC* v. *Wyoming*, 460 U. S. 226 (1983), where we held that state game wardens are covered by the ADEA, even though such employees are not expressly included within the ADEA's scope.

The majority asserts that its plain statement rule is helpful in avoiding a "potential constitutional problem." *Ante,* at 464. It is far from clear, however, why there would be a constitutional problem if the ADEA applied to state judges, in light of our decisions in *Garcia* and *Baker,* discussed above. As long as "the national political *process* did not operate in a defective manner, the Tenth Amendment is not implicated." *Baker, supra,* at 513. There is no claim in this case that the political process by which the ADEA was extended to state employees was inadequate to protect the States from being "unduly burden[ed]" by the Federal Government. See *Garcia, supra,* at 556. In any event, as discussed below, a straightforward analysis of the ADEA's definition of "employee" reveals that the ADEA does not apply here. Thus, even if there were potential constitutional problems in extending the ADEA to state judges, the majority's proposed plain statement rule would not be necessary to avoid them in this case. Indeed, because this case can be decided purely on the basis of statutory interpretation, the majority's announcement of its plain statement rule, which purportedly is derived from constitutional principles, *violates* our general practice of avoiding the unnecessary resolution of constitutional issues.

My disagreement with the majority does not end with its unwarranted announcement of the plain statement rule. Even more disturbing is its treatment of Congress' power under § 5 of the Fourteenth Amendment. See *ante,* at 467–470. Section 5 provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Despite that sweeping constitutional delegation of authority to Congress, the majority holds that its plain statement rule will apply with full force to legislation enacted to enforce the Fourteenth Amendment. The majority states: "In the face of . . . ambiguity, we will not attribute to Congress an intent to intrude on state governmental functions *regardless of whether Congress acted pursuant to its*

*Commerce Clause powers or § 5 of the Fourteenth Amendment." Ante,* at 470 (emphasis added).[1]

The majority's failure to recognize the special status of legislation enacted pursuant to § 5 ignores that, unlike Congress' Commerce Clause power, "[w]hen Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority." *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 456 (1976). Indeed, we have held that "principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments 'by appropriate legislation.' Those Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty." *City of Rome* v. *United States,* 446 U. S. 156, 179 (1980); see also *EEOC* v. *Wyoming, supra,* at 243, n. 18.

The majority relies upon *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1 (1981), see *ante,* at 469–470, but that case does not support its approach. There, the Court merely stated that "we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." 451 U. S., at 16. In other words, the *Pennhurst* presumption was designed only to answer the question whether a particular piece of legisla-

---

[1] In *EEOC* v. *Wyoming,* 460 U. S. 226 (1983), we held that the extension of the ADEA to the States was a valid exercise of congressional power under the Commerce Clause. We left open, however, the issue whether it was also a valid exercise of Congress' power under § 5 of the Fourteenth Amendment. Cf. *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 453, n. 9 (1976) (extension of Title VII of Civil Rights Act of 1964 to States was pursuant to Congress' § 5 power). Although we need not resolve the issue in this case, I note that at least two Courts of Appeals have held that the ADEA was enacted pursuant to Congress' § 5 power. See *Heiar* v. *Crawford County,* 746 F. 2d 1190, 1193–1194 (CA7 1984); *Ramirez* v. *Puerto Rico Fire Service,* 715 F. 2d 694, 700 (CA1 1983).

tion was enacted pursuant to § 5. That is very different from the majority's apparent holding that even when Congress *is* acting pursuant to § 5, it nevertheless must specify the precise details of its enactment.

The majority's departures from established precedent are even more disturbing when it is realized, as discussed below, that this case can be affirmed based on simple statutory construction.

## II

The statute at issue in this case is the ADEA's definition of "employee," which provides:

> "The term 'employee' means an individual employed by any employer except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency, or political subdivision." 29 U. S. C. § 630(f).

A parsing of that definition reveals that it excludes from the definition of "employee" (and thus the coverage of the ADEA) four types of (noncivil service) state and local employees: (1) persons elected to public office; (2) the personal staff of elected officials; (3) persons appointed by elected officials to be on the policymaking level; and (4) the immediate advisers of elected officials with respect to the constitutional or legal powers of the officials' offices.

The question before us is whether petitioners fall within the third exception. Like the Court of Appeals, see 898 F. 2d 598, 600 (CA8 1990), I assume that petitioners, who were initially appointed to their positions by the Governor of

Missouri, are "appointed" rather than "elected" within the meaning of the ADEA. For the reasons below, I also conclude that petitioners are "on the policymaking level."[2]

"Policy" is defined as "a definite course or method of action selected (as by a government, institution, group, or individual) from among alternatives and in the light of given conditions to guide and usu[ally] determine present and future decisions." Webster's Third New International Dictionary 1754 (1976). Applying that definition, it is clear that the decisionmaking engaged in by common-law judges, such as petitioners, places them "on the policymaking level." In resolving disputes, although judges do not operate with unconstrained discretion, they do choose "from among alternatives" and elaborate their choices in order "to guide and . . . determine present and future decisions." The quotation from Justice Holmes in the majority's opinion, see *ante*, at 466, is an eloquent description of the policymaking nature of the judicial function. Justice Cardozo also stated it well:

> "Each [common-law judge] indeed is legislating within the limits of his competence. No doubt the limits for the judge are narrower. He legislates only between gaps. He fills the open spaces in the law. . . . [W]ithin the confines of these open spaces and those of precedent and tradition, choice moves with a freedom which stamps its action as creative. The law which is the resulting product is not found, but made." B. Cardozo, The Nature of the Judicial Process 113–115 (1921).

---

[2] Most of the lower courts that have addressed the issue have concluded that appointed state judges fall within the "appointee[s] on the policymaking level" exception. See 898 F. 2d 598 (CA8 1990) (case below); *EEOC* v. *Massachusetts*, 858 F. 2d 52 (CA1 1988); *Sabo* v. *Casey*, 757 F. Supp. 587 (ED Pa. 1991); *In re Stout*, 521 Pa. 571, 559 A. 2d 489 (1989); see also *EEOC* v. *Illinois*, 721 F. Supp. 156 (ND Ill. 1989). But see *EEOC* v. *Vermont*, 904 F. 2d 794 (CA2 1990); *Schlitz* v. *Virginia*, 681 F. Supp. 330 (ED Va.), rev'd on other grounds, 854 F. 2d 43 (CA4 1988).

Moreover, it should be remembered that the statutory exception refers to appointees "on the policymaking level," not "policymaking employees." Thus, whether or not judges actually *make* policy, they certainly are on the same *level* as policymaking officials in other branches of government and therefore are covered by the exception. The degree of responsibility vested in judges, for example, is comparable to that of other officials that have been found by the lower courts to be on the policymaking level. See, *e. g.*, *EEOC* v. *Reno*, 758 F. 2d 581 (CA11 1985) (assistant state attorney); *EEOC* v. *Board of Trustees of Wayne Cty. Community College*, 723 F. 2d 509 (CA6 1983) (president of community college).

Petitioners argue that the "appointee[s] on the policymaking level" exception should be construed to apply "only to persons who advise or work closely with the elected official that chose the appointee." Brief for Petitioners 18. In support of that claim, petitioners point out that the exception is "sandwiched" between the "personal staff" and "immediate adviser" exceptions in § 630(f), and thus should be read as covering only similar employees.

Petitioners' premise, however, does not prove their conclusion. It is true that the placement of the "appointee" exception between the "personal staff" and "immediate adviser" exceptions suggests a similarity among the three. But the most obvious similarity is simply that each of the three sets of employees are connected in some way with elected officials: The first and third sets have a certain working relationship with elected officials, while the second is *appointed* by elected officials. There is no textual support for concluding that the second set must *also* have a close working relationship with elected officials. Indeed, such a reading would tend to make the "appointee" exception superfluous since the "personal staff" and "immediate adviser" exceptions would seem to cover most appointees who are in a close working relationship with elected officials.

Petitioners seek to rely on legislative history, but it does not help their position. There is little legislative history discussing the definition of "employee" in the ADEA, so petitioners point to the legislative history of the identical definition in Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e(f). If anything, that history tends to confirm that the "appointee[s] on the policymaking level" exception was designed to exclude from the coverage of the ADEA all high-level appointments throughout state government structures, including judicial appointments.

For example, during the debates concerning the proposed extension of Title VII to the States, Senator Ervin repeatedly expressed his concern that the (unamended) definition of "employee" would be construed to reach those "persons who exercise the legislative, executive, *and judicial* powers of the States and political subdivisions of the States." 118 Cong. Rec. 1838 (1972) (emphasis added). Indeed, he expressly complained that "[t]here is not even an exception in the [unamended] bill to the effect that the EEOC will not have jurisdiction over . . . State judges, whether they are elected or appointed to office." *Id.*, at 1677. Also relevant is Senator Taft's comment that, in order to respond to Senator Ervin's concerns, he was willing to agree to an exception not only for elected officials, but also for "those at the top decisionmaking levels in the executive and judicial branch as well." *Id.*, at 1838.

The definition of "employee" subsequently was modified to exclude the four categories of employees discussed above. The Conference Committee that added the "appointee[s] on the policymaking level" exception made clear the separate nature of that exception:

> "It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisors *or* to policymaking positions at *the highest levels* of the departments or agencies of State or local governments, such as

cabinet officers, and persons with comparable respon-sibilities at the local level." H. R. Conf. Rep. No. 92–899, pp. 15–16 (1972) (emphasis added).

The italicized "or" in that statement indicates, contrary to petitioners' argument, that appointed officials need not be ad-visers to be covered by the exception. Rather, it appears that "Congress intended two categories: policymakers, who need not be advisers; and advisers, who need not be policy-makers." *EEOC* v. *Massachusetts*, 858 F. 2d 52, 56 (CA1 1988). This reading is confirmed by a statement by one of the House Managers, Representative Erlenborn, who ex-plained that "[i]n the conference, an additional qualification was added, exempting those people appointed by officials at the State and local level in policymaking positions." 118 Cong. Rec., at 7567.

In addition, the phrase "the highest levels" in the Confer-ence Report suggests that Congress' intent was to limit the exception "down the chain of command, and not so much across agencies or departments." *EEOC* v. *Massachusetts*, 858 F. 2d, at 56. I also agree with the First Circuit's con-clusion that even lower court judges fall within the exception because "each judge, as a separate and independent judicial officer, is at the very top of his particular 'policymaking' chain of command, responding . . . only to a higher appellate court." *Ibid.*

For these reasons, I would hold that petitioners are ex-cluded from the coverage of the ADEA because they are "appointee[s] on the policymaking level" under 29 U. S. C. § 630(f).[3]

_____

[3] The dissent argues that we should defer to the EEOC's view regard-ing the scope of the "policymaking level" exception. See *post*, at 493–494. I disagree. The EEOC's position is not embodied in any formal issuance from the agency, such as a regulation, guideline, policy statement, or ad-ministrative adjudication. Instead, it is merely the EEOC's *litigating* position in recent lawsuits. Accordingly, it is entitled to little if any def-erence. See, *e. g.*, *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204,

I join Parts I and III of the Court's opinion and concur in its judgment.

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL joins, dissenting.

I agree entirely with the cogent analysis contained in Part I of JUSTICE WHITE's opinion, *ante*, at 474–481. For the reasons well stated by JUSTICE WHITE, the question we must resolve is whether appointed Missouri state judges are excluded from the general *prohibition* of mandatory retirement that Congress established in the federal Age Discrimination in Employment Act of 1967 (ADEA), 29 U. S. C. §§ 621–634. I part company with JUSTICE WHITE, however, in his determination that appointed state judges fall within the narrow exclusion from ADEA coverage that Congress created for an "appointee on the policymaking level." § 630(f).

I

For two reasons, I do not accept the notion that an appointed state judge is an "appointee on the policymaking level." First, even assuming that judges may be described as policymakers in certain circumstances, the structure and legislative history of the policymaker exclusion make clear that judges are not the kind of policymakers whom Congress intended to exclude from the ADEA's broad reach. Second,

---

212–213 (1988); *St. Agnes Hospital* v. *Sullivan*, 284 U. S. App. D. C. 396, 401, 905 F. 2d 1563, 1568 (1990). Although the dissent does cite to an EEOC decision involving the policymaking exception in Title VII, see *post*, at 494, that decision did not state, even in dicta, that the exception is limited to those who work closely with elected officials. Rather, it merely stated that the exception applies to officials "on the highest levels of state or local government." CCH EEOC Decisions (1983) ¶ 6725. In any event, the EEOC's position is, for the reasons discussed above, inconsistent with the plain language of the statute at issue. "[N]o deference is due to agency interpretations at odds with the plain language of the statute itself." *Public Employees Retirement System of Ohio* v. *Betts*, 492 U. S. 158, 171 (1989).

whether or not a plausible argument may be made for judges' being policymakers, I would defer to the EEOC's reasonable construction of the ADEA as covering appointed state judges.

A

Although it may be possible to define an appointed judge as a "policymaker" with only a dictionary as a guide,[1] we have an obligation to construe the exclusion of an "appointee on the policymaking level" with a sensitivity to the context in which Congress placed it. In construing an undefined statutory term, this Court has adhered steadfastly to the rule that "'''"words grouped in a list should be given related meaning,'"'" *Dole* v. *Steelworkers*, 494 U. S. 26, 36 (1990), quoting *Massachusetts* v. *Morash*, 490 U. S. 107, 114–115 (1989), quoting *Schreiber* v. *Burlington Northern, Inc.*, 472 U. S. 1, 8 (1985), quoting *Securities Industry Assn.* v. *Board of Governors, FRS*, 468 U. S. 207, 218 (1984), and that "'in expounding a statute, we [are] not . . . guided by a single sentence or member of a sentence, but look to the provisions of

---

[1] JUSTICE WHITE finds the dictionary definition of "policymaker" broad enough to include the Missouri judges involved in this case, because judges resolve disputes by choosing "'from among alternatives' and elaborate their choices in order 'to guide and . . . determine present and future decisions.'" *Ante*, at 482. See also 898 F. 2d 598, 601 (CA8 1990) (case below), quoting *EEOC* v. *Massachusetts*, 858 F. 2d 52, 55 (CA1 1988). I hesitate to classify judges as policymakers, even at this level of abstraction. Although some part of a judge's task may be to fill in the interstices of legislative enactments, the *primary* task of a judicial officer is to apply rules reflecting the policy choices made by, or on behalf of, those elected to legislative and executive positions. A judge is first and foremost one who resolves disputes, and not one charged with the duty to fashion broad policies establishing the rights and duties of citizens. That task is reserved primarily for legislators. See *EEOC* v. *Vermont*, 904 F. 2d 794, 800–801 (CA2 1990).

Nor am I persuaded that judges should be considered policymakers because they sometimes fashion court rules and are otherwise involved in the administration of the state judiciary. See *In re Stout*, 521 Pa. 571, 583–586, 559 A. 2d 489, 495–497 (1989). These housekeeping tasks are at most ancillary to a judge's primary function described above.

the whole law, and to its object and policy.'" *Morash*, 490 U. S., at 115, quoting *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41, 51 (1987). Applying these maxims of statutory construction, I conclude that an appointed state judge is not the kind of "policymaker" whom Congress intended to exclude from the protection of the ADEA.

The policymaker exclusion is placed between the exclusion of "any person chosen by such [elected] officer to be on such officer's personal staff" and the exclusion of "an immediate adviser with respect to the exercise of the constitutional or legal powers of the office." See 29 U. S. C. § 630(f). Reading the policymaker exclusion in light of the other categories of employees listed with it, I conclude that the class of "appointee[s] on the policymaking level" should be limited to those officials who share the characteristics of personal staff members and immediate advisers, *i. e.*, those who work closely with the appointing official and are directly accountable to that official. Additionally, I agree with the reasoning of the Second Circuit in *EEOC* v. *Vermont*, 904 F. 2d 794 (1990):

> "Had Congress intended to except a wide-ranging category of policymaking individuals operating wholly independently of the elected official, it would probably have placed that expansive category at the end of the series, not in the middle." *Id.*, at 798.

Because appointed judges are not accountable to the official who appoints them and are precluded from working closely with that official once they have been appointed, they are not "appointee[s] on the policymaking level" for purposes of 29 U. S. C. § 630(f).[2]

---

[2] I disagree with JUSTICE WHITE's suggestion that this reading of the policymaking exclusion renders it superfluous. *Ante*, at 483. There exist policymakers who work closely with an appointing official but who are appropriately classified as neither members of his "personal staff" nor "immediate adviser[s] with respect to the exercise of the constitutional or legal powers of the office." Among others, certain members of the Governor's

## B

The evidence of Congress' intent in enacting the policy-making exclusion supports this narrow reading. As noted by JUSTICE WHITE, *ante*, at 484, there is little in the legislative history of § 630(f) itself to aid our interpretive endeavor. Because Title VII of the Civil Rights Act of 1964, § 701(f), as amended, 42 U. S. C. § 2000e(f), contains language identical to that in the ADEA's policymaking exclusion, however, we accord substantial weight to the legislative history of the cognate Title VII provision in construing § 630(f). See *Lorillard* v. *Pons*, 434 U. S. 575, 584 (1978) (noting that "the prohibitions of the ADEA were derived *in haec verba* from Title VII"). See also *Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 121 (1985); *Oscar Mayer & Co.* v. *Evans*, 441 U. S. 750, 756 (1979); *EEOC* v. *Vermont*, 904 F. 2d, at 798.

When Congress decided to amend Title VII to include States and local governments as employers, the original bill did not contain any employee exclusion. As JUSTICE WHITE notes, *ante*, at 484, the absence of a provision excluding certain state employees was a matter of concern for Senator Ervin, who commented that the bill, as reported, did not contain a provision "to the effect that the EEOC will not have jurisdiction over . . . State judges, whether they are elected or appointed to office . . . ." 118 Cong. Rec. 1677 (1972). Because this floor comment refers to appointed judges, JUSTICE WHITE concludes that the later amendment containing the exclusion of "an appointee on the policymaking level" was drafted in response to the concerns raised by Senator Ervin and others, *ante*, at 484–485, and therefore should be read to include judges.

Even if the only legislative history available was the above-quoted statement of Senator Ervin and the final

---

Cabinet and high level state agency officials well might be covered by the policymaking exclusion, as I construe it.

amendment containing the policymaking exclusion, I would be reluctant to accept JUSTICE WHITE's analysis. It would be odd to conclude that the general exclusion of those "on the policymaking level" was added in response to Senator Ervin's very specific concern about appointed judges. Surely, if Congress had desired to exclude judges — and was responding to a specific complaint that judges would be within the jurisdiction of the EEOC — it would have chosen far clearer language to accomplish this end.[3] In any case, a more detailed look at the genesis of the policymaking exclusion seriously undermines the suggestion that it was intended to include appointed judges.

After commenting on the absence of an employee exclusion, Senator Ervin proposed the following amendment:

> "[T]he term 'employee' as set forth in the original act of 1964 and as modified by the pending bill shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such person to advise him in respect to the exercise of the constitutional or legal powers of his office." 118 Cong. Rec. 4483 (1972).

Noticeably absent from this proposed amendment is any reference to those on the policymaking level or to judges. Senator Williams then suggested expanding the proposed amendment to include the personal staff of the elected individual, leading Senators Williams and Ervin to engage in the following discussion about the purpose of the amendment:

---

[3] The majority acknowledges this anomaly by noting that "'appointee [on] the policymaking level,' particularly in the context of the other exceptions that surround it, is an odd way for Congress to exclude judges; a plain statement that judges are not 'employees' would seem the most efficient phrasing." *Ante*, at 467. The majority dismisses this objection not by refuting it, but by noting that "we are not looking for a plain statement that judges are excluded." *Ibid.* For the reasons noted in Part I of JUSTICE WHITE's opinion, this reasoning is faulty; appointed judges are covered unless they fall within the enumerated exclusions.

"Mr. WILLIAMS: . . . .

". . . First, State and local governments are now included under the bill as employers. The amendment would provide, for the purposes of the bill and for the basic law, that an elected individual is not an employee and, th[e]refore, the law could not cover him. The next point is that the elected official would, in his position as an employer, not be covered and would be exempt in the employment of certain individuals.

.         .         .         .         .

". . . [B]asically the purpose of the amendment . . . [is] to exempt from coverage those who are chosen by the Governor or the mayor or the county supervisor, whatever the elected official is, and who are in a close personal relationship and an immediate relationship with him. Those who are his first line of advisers. Is that basically the purpose of the Senator's amendment?

"Mr. ERVIN: I would say to my good friend from New Jersey that that is the purpose of the amendment." *Id.*, at 4492–4493.

Following this exchange, Senator Ervin's amendment was expanded to exclude "any person chosen by such officer to be a personal assistant." *Id.*, at 4493. The Senate adopted these amendments, voting to exclude both personal staff members and immediate advisers from the scope of Title VII.

The policymaker exclusion appears to have arisen from Senator Javits' concern that the exclusion for advisers would sweep too broadly, including hundreds of functionaries such as "lawyers, . . . stenographers, subpena servers, researchers, and so forth." *Id.*, at 4097. Senator Javits asked "to have overnight to check into what would be the status of that rather large group of employees," noting that he "realize[d] that . . . Senator [Ervin was] . . . seeking to confine it to the higher officials in a policymaking or policy advising capacity."

*Ibid.* In an effort to clarify his point, Senator Javits later stated:

> "The other thing, the immediate advisers, I was thinking more in terms of a cabinet, of a Governor who would call his commissioners a cabinet, or he may have a cabinet composed of three or four executive officials, or five or six, who would do the main and important things. That is what I would define those things expressly to mean." *Id.*, at 4493.

Although Senator Ervin assured Senator Javits that the exclusion of personal staff and advisers affected only the classes of employees that Senator Javits had mentioned, *ibid.*, the Conference Committee eventually adopted a specific exclusion of an "appointee on the policymaking level" as well as the exclusion of personal staff and immediate advisers contained in the Senate bill. In explaining the scope of the exclusion, the conferees stated:

> "It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisors or to policymaking positions at the highest levels of the departments or agencies of State or local governments, such as cabinet officers, and persons with comparable responsibilities at the local level. It is the conferees['] intent that this exemption shall be construed narrowly." S. Conf. Rep. No. 92–681, pp. 15–16 (1972).

The foregoing history decisively refutes the argument that the policymaker exclusion was added in response to Senator Ervin's concern that appointed state judges would be protected by Title VII. Senator Ervin's own proposed amendment did not exclude those on the policymaking level. Indeed, Senator Ervin indicated that all of the policymakers he sought to have excluded from the coverage of Title VII were encompassed in the exclusion of personal staff and immediate advisers. It is obvious that judges are neither staff nor im-

mediate advisers of any elected official. The only indication as to whom Congress understood to be "appointee[s] on the policymaking level" is Senator Javits' reference to members of the Governor's cabinet, echoed in the Conference Committee's use of "cabinet officers" as an example of the type of appointee at the policymaking level excluded from Title VII's definition of "employee." When combined with the Conference Committee's exhortation that the exclusion be construed narrowly, this evidence indicates that Congress did *not* intend appointed state judges to be excluded from the reach of Title VII or the ADEA.

## C

This Court has held that when a statutory term is ambiguous or undefined, a court construing the statute should defer to a reasonable interpretation of that term proffered by the agency entrusted with administering the statute. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). Thus, even were I to conclude that one might read the exclusion of an "appointee on the policymaking level" to include state judges, our precedent would compel me to accept the EEOC's contrary reading of the exclusion if it were a "permissible" interpretation of this ambiguous term. *Id.*, at 843. This Court has recognized that "it is axiomatic that the EEOC's interpretation of Title VII, for which it has primary enforcement responsibility, need not be the best one by grammatical or any other standards. Rather, the EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference." *EEOC* v. *Commercial Office Products Co.*, 486 U. S. 107, 115 (1988). The EEOC's interpretation of ADEA provisions is entitled to the same deference as its interpretation of analogous provisions in Title VII. See *Oscar Mayer & Co.* v. *Evans*, 441 U. S., at 761, citing *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 434 (1971).

The EEOC consistently has taken the position that an appointed judge is not an "appointee on the policymaking level" within the meaning of 29 U. S. C. § 630(f). See *EEOC* v. *Vermont*, 904 F. 2d 794 (CA2 1990); *EEOC* v. *Massachusetts*, 858 F. 2d 52 (CA1 1988); *EEOC* v. *Illinois*, 721 F. Supp. 156 (ND Ill. 1989). Relying on the legislative history detailed above, the EEOC has asserted that Congress intended the policymaker exclusion to include only "'an elected official's first line advisers.'" *EEOC* v. *Massachusetts*, 858 F. 2d, at 55. See also CCH EEOC Decisions (1983) ¶ 6725 (discussing the meaning of the policymaker exclusion under Title VII, and stating that policymakers "must work closely with elected officials and their advisors in developing policies that will implement the overall goals of the elected officials"). As is evident from the foregoing discussion, I believe this to be a correct reading of the statute and its history. At a minimum, it is a "permissible" reading of the indisputably ambiguous term "appointee on the policymaking level." Accordingly, I would defer to the EEOC's reasonable interpretation of this term.[4]

---

[4] Relying on *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204 (1988), JUSTICE WHITE would conclude that the EEOC's view of the scope of the policymaking exclusion is entitled to "little if any deference" because it is "merely the EEOC's *litigating* position in recent lawsuits." *Ante*, at 485, n. 3. This case is distinguishable from *Bowen*, however, in two important respects. First, unlike in *Bowen*, where the Court declined to defer "to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice," 488 U. S., at 212, the EEOC here has issued an administrative ruling construing Title VII's cognate policymaking exclusion that is entirely consistent with the agency's subsequent "litigation position" that appointed judges are not the kind of officials on the policymaking level whom Congress intended to exclude from ADEA coverage. See CCH EEOC Decisions (1983) ¶ 6725. Second, the Court in *Bowen* emphasized that the agency had failed to offer "a reasoned and consistent view of the scope of" the relevant statute and had proffered an interpretation of the statute that was "contrary to the narrow view of that provision advocated in past cases." See 488 U. S., at 212–213. In contrast, however, the EEOC never has wavered from its view that the

II

The Missouri constitutional provision mandating the retirement of a judge who reaches the age of 70 violates the ADEA and is, therefore, invalid.[5] Congress enacted the ADEA with the express purpose "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U. S. C. § 621. Congress provided for only limited exclusions from the coverage of the ADEA, and exhorted courts applying this law to construe such exclusions narrowly. The statute's structure and legislative history reveal that Congress did not intend an appointed state judge to be beyond the scope of the ADEA's protective reach. Further, the EEOC, which is charged with the enforcement of the ADEA, has determined that an appointed state judge is covered by the ADEA. This Court's precedent dictates that we defer to the EEOC's permissible interpretation of the ADEA.

I dissent.

---

policymaking exclusion does not apply to appointed judges. Thus, this simply is *not* a case in which a court is asked to defer to "nothing more than an agency's convenient litigating position." *Id.*, at 213. For all the reasons that deference was inappropriate in *Bowen*, it is appropriate here.

[5] Because I conclude that the challenged Missouri constitutional provision violates the ADEA, I need not consider petitioners' alternative argument that the mandatory retirement provision violates the Fourteenth Amendment to the United States Constitution. See *Carnival Cruise Lines, Inc.* v. *Shute*, 499 U. S. 585, 589–590 (1991).