Michael L. PARR, Michael Guter, Galen McCray, Gary Clark, Benny Rincon, Art Smith, Richard Walsh, Alfonso Cervantes, and Larry Crabtree, Individually and on Behalf of Other Persons Similarly Situated,

v.

STATE OF CALIFORNIA; Gray Davis, Controller of the State of California.

No. CIV–S–92–1115 GEB/PAN.

United States District Court, E.D. California.

Dec. 2, 1992.

Gary Marc Messing, Sacramento, CA, for plaintiffs.

Larry Guy Raskin, Deputy Atty. Gen., Sacramento, CA, for defendants.

## ORDER

BURRELL, District Judge.

### I. INTRODUCTION

Plaintiffs are State employees who allege defendants violated the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201–19, by paying plaintiffs' wages with registered warrants.[1] Plaintiffs allege the FLSA and its enabling regulations require employers to pay employees (1) in cash or its equivalent and (2) promptly. Plaintiffs seek partial summary judgment, claiming defendants violated 29 U.S.C. §§ 206 and 207 by failing to pay plaintiffs' wages promptly in cash or its equivalent.[2] Defendants argue that requiring them to pay their employees promptly in cash or its equivalent would violate the Tenth Amendment, and that they have satisfied the FLSA.

Even though the budget impasse which caused the State to issue registered warrants has been resolved, this case is not moot because it satisfies the "capable of repetition yet evading review" exception to the mootness doctrine, since the budget impasse is likely to recur. It is therefore appropriate for the court to consider declaratory relief in this case.[3]

### II. FACTS

#### A. *Consequences of the 1992 State budget impasse*

This case represents a new phase in the State's continuing efforts to comply with the FLSA during a budget impasse. During the 1991 budget impasse, the State withheld its employees' wages until a budget passed. However, Judge Shubb held this practice violated "an implied requirement [of the FLSA] that wages be paid promptly when due." *Biggs v. Wilson,*

1. Plaintiffs sue individually and on behalf of other persons similarly situated, pursuant to 29 U.S.C. § 216(b). Section 216(b) provides that an employee may sue an employer who violates 29 U.S.C. § 206 or § 207 on the employee's own behalf and on behalf of other employees similarly situated. However, "[n]o employee shall be a party plaintiff ... unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). As of September 4, 1992, 86 employees had filed consents in this action, including the plaintiffs named in the caption above.

2. Plaintiffs do not seek summary judgment on their damages claim based on defendants' alleged violation of the FLSA. An employer who violates § 206 or § 207 is liable to the affected employee or employees for their unpaid minimum wages or overtime pay, an additional equal amount as liquidated damages, and reasonable attorney's fees and costs. 29 U.S.C. § 216(b). Attorney's fees are mandatory, but the court has discretion to award liquidated damages in accordance with proof that the employer acted in good faith and reasonably believed his or her acts did not violate the FLSA. 29 U.S.C. §§ 216(b), 260.

3. *See Pratt v. Wilson,* 770 F.Supp. 539 (E.D.Cal. 1991), where the court held that a suit related to the State's 1990 budget impasse satisfied the "capable of repetition, yet evading review" exception to the mootness doctrine because the challenged State action was of limited duration and likely to recur, "given the fact that the state ha[d] not timely adopted a budget in five of the last eight years." *Id.* at 543. The tally is now seven of the last ten years.

Case No. CIV S–90–0942–WBS–GGH (E.D.Cal. October 3, 1991) at 6.[4] During the 1992 budget impasse, the State paid its employees on their regular paydays with registered warrants. The State relied on private financial institutions to purchase State employees' warrants so the employees would receive their wages without interruption despite the budget impasse.

Defendants normally pay plaintiffs' wages with regular warrants.[5] Under State law, the State can issue warrants only if two requirements are met: (1) the expenditure must be authorized by law, and (2) the particular fund the warrant is to be drawn on must have sufficient unexhausted appropriations to meet the warrant. Cal.Gov't.Code § 12440.[6] If these requirements are met and the State has sufficient cash to pay the warrant on demand, the State issues regular warrants. If these requirements are met for warrants from the general fund, but there is insufficient cash in the general fund to issue regular warrants, the State can issue registered warrants. Cal.Gov't.Code § 17221.[7]

Because the State Legislature and Governor failed to agree on a budget by the conclusion of the fiscal year ending June 30, 1992, no unexhausted appropriation was available to satisfy the statutory requirements for issuing warrants to pay plaintiffs after that date. In the absence of a budget appropriation, the State Legislature passed an emergency appropriation bill, approved by the Governor July 14, 1992, authorizing the Controller to compensate State employees for the period from July 1, 1992 until the Budget Act of 1992 was passed. 1992 Cal.Legis.Serv. No. 7, ch. 205, § 2. The purpose of the emergency appropriation bill was:

> to eliminate the possibility of injunctive relief and liquidated damages being awarded against the state under the [FLSA] in the event [state employees], whether or not subject to the [*Biggs, supra*] decision, are not paid on their regularly scheduled payday.

1992 Cal.Legis.Serv. No. 7, ch. 205, § 1(b). Because of the *Biggs* court's holding that the FLSA requires employers to pay wages promptly, the State was concerned that not paying its employees until a budget passed would violate the FLSA.[8] Gray Davis News Release dated July 10, 1992, Ex. B to Messing's decl.

Although the appropriation bill satisfied the statutory requirements for issuing warrants, the State's general fund contained insufficient cash to issue regular warrants. The budget impasse prevented the State from following its usual practice of issuing revenue anticipation notes or revenue anticipation warrants to external sources and paying State employees with regular warrants. Defs.' br. at 3, defs.' Ex. 1 at 3, 5–6. Therefore, effective July 1, 1992, the State

---

**4.** *Biggs v. Wilson* is currently on appeal before the Ninth Circuit, Case No. 92–15334.

**5.** These warrants are also sometimes referred to in the parties' papers as "general," "normal" or "good" warrants. They are the State's equivalent of checks.

**6.** This section provides: "The Controller shall draw warrants on the Treasurer for the payment of money directed by law to be paid out of the State Treasury; but a warrant shall not be drawn unless authorized by law, and unless unexhausted specific appropriations provided by law are available to meet it."

**7.** This section provides: "Whenever the Controller draws his warrant upon the Treasurer payable out of the General Fund in an amount in excess of the balance remaining in the unapplied money in the General Fund after first deducting from such unapplied money the amount, as estimated by the Controller, which is required by law to be earmarked, reserved or set apart from such unapplied money for the payment of obligations of the State having priority over the obligation to which such warrant is applicable, the Controller shall upon the same day present it to the Treasurer. The Treasurer shall endorse upon its back the date of presentation by the Controller; that it is not paid for want of funds; and that it bears interest at the rate fixed pursuant to law from the date of such registration to and including the date of maturity, or the date upon which the Treasurer first advertises that it is payable upon presentation if it bears no date of maturity. Warrants so endorsed by the Treasurer are registered warrants."

**8.** The Legislature's emergency appropriation bill, the State Controller's news release dated July 10, 1992, and the State Controller's legal staff's opinion dated July 10, 1992 all cite *Biggs*. Messing decl., Exs. A and B.

began issuing registered warrants for all general fund obligations except priority obligations noted in the State Constitution. Defs.' Ex. 1 at 6. State employees normally paid out of the general fund received registered warrants.[9]

### B. *Registered warrants*

■ Regular warrants and registered warrants are significantly different. A regular warrant is payable on demand from existing State funds, but a registered warrant is a "promise to pay." Letter from Gray Davis to all State employees, dated July 1, 1992, Ex. A to Beaver decl. However, no State funds exist to pay registered warrants when they are issued, so they are *not* payable on demand. Registered warrants are payable only when the State calls them for redemption. On redemption, the holder of the registered warrant is entitled to the face amount plus the percentage interest noted by the Treasurer on the warrant, in this case 5%. Anticipated Questions and Answers prepared by the Office of the State Controller, dated July 2, 1992, Ex. B to Beaver decl. The registered warrants issued beginning July 1, 1992 did not contain a specific redemption date. Rather, the warrants stated they were "not paid for want of funds" and would not be paid by the State until the State Treasurer "advertises that said warrant is payable upon presentation." VanHouten decl., defs.' Ex. 2, Ex. 1, Sample Warrant. Defendants expected all registered warrants issued through September 10, 1992, totalling approximately $2.65 billion, to be redeemable by September 23, 1992. Lenerd decl. dated August 31, 1992.

Most State employees received cash for their registered warrants, so they were timely compensated in full as if the State had paid them with regular warrants. However, not all financial institutions cashed or accepted the registered warrants; some financial institutions conditionally accepted or refused to accept them. Decls. of McCray, Clark, Rincon and Parr; VanHouten decl., defs.' Ex. 2, Ex. 9 (policies of

major banks regarding negotiating registered warrants); Broudy decl., defs. Ex. 3, Ex. A–2 (conditions on cashing/accepting registered warrants); Paulus decl., defs. Ex. 4, Ex. C–1 (Bank of America's announcement it would stop negotiating registered warrants effective August 5, 1992).

Additionally, defendants concede they knew, before issuing the registered warrants, that not all financial institutions would cash or accept the warrants. Gray Davis letter to State employees dated July 1, 1992, Ex. A to Beaver decl. (stating State Controller and Treasurer had confirmed that "most financial institutions" would cash the warrants at face value on presentation); Anticipated Questions & Answers prepared by the Office of the State Controller, dated July 2, 1992, Ex. B to Beaver decl. (stating "[M]ost major financial institutions have agreed to cash registered warrants, at least through the end of July.").

Defendants placed the task of finding a financial institution which would cash or accept the registered warrants upon State employees. Ex. B to Beaver decl. Direct deposit was not available for the registered warrants. *Id.* If employees' financial institutions would not accept registered warrants, the Controller suggested employees try other institutions. If employees chose to remain with their own financial institutions, the Controller advised employees they would "have to hold on to the warrant until it [was] redeemable." *Id.* For the July 30 payroll *only,* the State gave any employee unable to negotiate his or her registered warrant the additional option of exchanging the warrant for "a check you can cash," drawn on the employee's agency's revolving fund. Parr decl., Ex. B; Defs. Ex. 1, Attach. 12.

### III. DISCUSSION

Plaintiffs move for partial summary judgment, claiming defendants violated the FLSA by paying plaintiffs' wages with registered warrants. Summary judgment is proper where no genuine issue exists as to any material fact and the moving party is

---

9. State employees normally paid out of special funds received regular warrants. The State's

special funds did not have the same cash shortfall as its general fund.

entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In this case, the parties do not dispute the facts.

The State asserts that requiring it to pay its employees promptly and in cash or its equivalent as plaintiffs contend the FLSA requires would violate the Tenth Amendment. If the State must comply with the FLSA, and the FLSA requires prompt payment in cash or its equivalent, plaintiffs claim the State violated these requirements by paying plaintiffs' wages with registered warrants.

### A. The Tenth Amendment and the FLSA

The State argues that requiring it to pay its employees promptly in cash or its equivalent under the FLSA would violate the Tenth Amendment because it would undermine "the state's constitutional and statutory provisions regarding the budget process and the orderly scheme of payment of the State's obligations." Defs.' reply at 27. The State argues such a ruling would interfere with the State's sovereignty by "piercing the State's political solution to the State's fiscal crisis, and undermin[ing] the basic internal economic operations of the State itself during this fiscal crisis." Id.

■ The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Tenth Amendment states a "truism that all is retained which has not been surrendered." New York v. United States, — U.S. —, —, 112 S.Ct. 2408, 2418, 120 L.Ed.2d 120 (1992) (quoting United States v. Darby, 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941)). The purpose of the Tenth Amendment is to ensure that individuals within the various states enjoy certain freedoms under our constitutional democratic form of government. As the

Supreme Court recognized in New York v. United States:

> State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.

Id. — U.S. at —, 112 S.Ct. at 2431.

■ The Tenth Amendment confirms that the federal government has limited powers. However, Congress enacted the FLSA pursuant to its Commerce Clause powers, and requiring states to comply with the FLSA's minimum wage and overtime requirements does not violate the Tenth Amendment. Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).[10] In Garcia, the state "face[d] nothing more than the same ... obligations that hundreds of thousands of other employers, public as well as private, have to meet." Id. at 554, 105 S.Ct. at 1019. The Court chose to leave the protection of states' sovereignty from the federal government's exercise of its Commerce Clause powers to the political process of federalism. Id. at 556, 105 S.Ct. at 1020.[11] Under Garcia, if states object to complying with the FLSA, their recourse is to the political process of state participation in federal governmental action.

Two recent Supreme Court opinions discuss the Tenth Amendment. In Gregory v. Ashcroft, — U.S. —, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), state court judges challenged a state mandatory retirement provision, alleging it violated the federal Age Discrimination in Employment Act of 1967 ("ADEA"). The Court discussed the Tenth Amendment, emphasizing the importance to state sovereignty of states deciding their own judges' qualifications: "Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sover-

---

10. See also Bratt v. County of Los Angeles, 912 F.2d 1066, 1068 (9th Cir.1990) cert. denied — U.S. —, 111 S.Ct. 962, 112 L.Ed.2d 1049 (1991) (citing Garcia and rejecting Tenth Amendment challenge to application of FLSA to county probation and child protection activities).

11. Prior to Garcia, the FLSA was not applicable to the states when they were performing traditional governmental functions. National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The Garcia Court rejected National League of Cities' "traditional governmental functions" test. Garcia, 469 U.S. at 556–57, 105 S.Ct. at 1020–21.

eign." *Id.* —— U.S. at ——, 111 S.Ct. at 2400. The Court emphasized that federal courts must be certain of Congress' intent before finding that federal law overrides the constitutional balance of federal and state powers. *Id.* —— U.S. at ——, 111 S.Ct. at 2401. Because it was not clear Congress intended the ADEA to cover state court judges, the Court held the state mandatory retirement provision did not violate the ADEA. *Id.* —— U.S. at ——, 111 S.Ct. at 2404.

■ In this case, Congress' intent is clear. Congress intended by enacting the FLSA "to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act." *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 513 (9th Cir.1978) (quoting *Tennessee Coal, Iron and Railroad Co. v. Muscoda Local No. 123*, 321 U.S. 590, 602–03, 64 S.Ct. 698, 705, 88 L.Ed. 949 (1944)). Regulations requiring employers to pay wages in cash or its equivalent are consistent with that intent.

The Supreme Court is committed to the holding of *Garcia* where Congress subjects a state to the same legislation applicable to private parties. *New York v. United States*, —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). In *New York*, the Court discussed the Tenth Amendment and distinguished federal legislation applicable to both states and private parties from federal legislation forcing states to regulate in a particular way. The Court expressly stated it was not "revisit[ing]" *Garcia*'s holding. *New York*, —— U.S. at ——, 112 S.Ct. at 2420.

The State argues requiring it to pay its employees promptly and in cash would compromise the State's sovereignty to a degree not at issue in *Garcia*. However, requiring states to pay their employees promptly in cash or its equivalent is no more destructive of state sovereignty than requiring states to pay statutory minimum and overtime wages.

The State emphasizes the extreme nature of its fiscal crisis. However, the State's financial problems do not determine the Tenth Amendment issue. In deciding to make states subject to the FLSA, Congress recognized that states would be "forced to assume some additional financial responsibilities." H.R.Rep. No. 99–331, 99th Congress, 1st Sess. (1985), App. D to pls.' reply. After *Garcia* was decided in 1985, Congress passed a moratorium delaying application of the FLSA to states until April 15, 1986. The moratorium reflects states protecting their sovereignty through participation in federal governmental action. It also indicates Congress supported the Court's holding in *Garcia* and was committed to giving state employees the protection of the FLSA despite the cost to states.

Based on *Garcia* and subsequent Supreme Court and Ninth Circuit cases, requiring the State to comply with the FLSA does not violate the Tenth Amendment. Therefore, the next issue is whether defendants violated the FLSA by paying plaintiffs' wages with registered warrants.

B. *Violation of the FLSA*

Plaintiffs allege defendants violated the FLSA in two ways: by not paying them in cash or its equivalent and by not paying them promptly. In contrast to 1991, when the State withheld employees' wages during a two-week budget impasse, in 1992, the State made timely payment, with registered warrants. Plaintiffs allege the *form* of payment caused them to suffer damage from negotiation delays. Plaintiffs' two arguments are simply different challenges to the State's payment of wages with registered warrants. The challenge to the timeliness of payment stems from the use of an instrument that not all plaintiffs were able to freely negotiate.

The FLSA does not explicitly require employers to pay statutory wages in cash or its equivalent. However, the FLSA requires employers to pay employees a minimum hourly wage and overtime, and the FLSA's implementing regulations require payment of these statutory wages "in cash or its equivalent." 29 U.S.C. §§ 206 and 207, 29 C.F.R. § 531.27. Employers must pay statutory wages "in cash or negotiable instrument payable at par" and "finally

and unconditionally or 'free and clear.'" 29 C.F.R. §§ 531.27, 531.35. They may not pay these wages in scrip or a similar medium. 29 C.F.R. § 531.34.[12]

■ Administrative regulations have the force of law as long as they are consistent with the purposes of the legislation. *Martinez v. Marshall*, 573 F.2d 555, 559 (9th Cir.1977). Since the FLSA is silent on the cash/cash equivalent issue, the court must give the above cited regulations "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The cited regulations are consistent with the FLSA's stated purpose of eliminating "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" and are not arbitrary or capricious. 29 U.S.C. § 202. Therefore, these regulations have the force of law.

Because the statute and regulations do not define "cash or its equivalent" and no cases have addressed whether registered warrants satisfy this requirement, the court looks to other sources to compare registered warrants to cash. These include definitions of "cash," federal regulation of the warrants, California statutes, case law, and evidence of the warrants' negotiability in fact.

1. Definitions of "cash".

■ Cash is "ready money," broadly including "bank deposits and certain readily negotiable paper (as checks, drafts, notes, bearer bonds, coupons)." Webster's Third International Dictionary at 346 (1986). "Cash" is distinguishable from "money":

> [M]oney is the more general term and stresses the medium or token, whereas "cash" stresses the readiness of the medium, as distinguished from credit or

slow assets. "Cash" means especially "ready money" at command, subject to free disposal and not tied up in a fixed state; it is almost the equivalent of the term "loose money."

54 Am.Jur.2d, MONEY, § 2 at 552. Registered warrants are not cash under this definition, because they are not readily negotiable or freely disposable, since they are not payable on demand.

2. Federal regulation of registered warrants.

According to the Federal Reserve Bank, registered warrants are neither cash nor checks. Registered warrants are not cash under the Federal Reserve Bank's definition of noncash items for purposes of regulating checks:

> *Noncash item* means an item that would otherwise be a check except that ... [i]t is accompanied by special instructions, such as a request for special advice of payment or dishonor.

12 C.F.R. § 229.2(u). The warrants plaintiffs received were noncash items because they were accompanied by special instructions. The warrants were "not paid for want of funds" and were not payable until the State Treasurer advertised they were payable. VanHouten decl., defs.' Ex. 2, Ex. 2. Registered warrants also cannot be treated as checks under Federal Reserve Bank rules: "Because a registered warrant is not immediately payable, it is not considered a check." Mulford decl., Defs. Ex. 2, Ex. 6, Attach. A.

Federal banking regulators treated the registered warrants plaintiffs received not as cash or checks, but as debt securities, regulating them in the same manner as State-issued general obligation bonds. The registered warrants received "the same risk-based capital treatment as general ob-

---

**12.** This section provides: "Scrip, tokens, credit cards, 'dope checks,' coupons, and similar devices are not proper mediums of payment under the [FLSA]. They are neither cash nor 'other facilities' [such as board or lodging]." 29 C.F.R. § 531.34.

"Scrip" is "a certificate of indebtedness in the form of a promise to pay or a certification good for money or goods receivable from a concern that needs funds or pays wages partly in orders on a company store." Webster's Third International Dictionary at 2041 (1986).

**514**

ligation bonds."[13] Federal regulators advised banks and thrifts that there would be "no regulatory limit on a bank's or thrift's *investment*" in registered warrants since the warrants were to be regulated as general obligation bonds. *Id.* (emphasis added) However, the regulators advised these institutions "to exercise prudent judgment in determining *whether* and the extent to which they should accept" the warrants. *Id.* (emphasis added).[14]

In sum, federal regulators required financial institutions to treat the registered warrants not as cash or checks, but as debt instruments, because they were not payable on demand as regular warrants are. This fact suggests that registered warrants are more like debt instruments than cash.

### 3. California statutes.

California Government Code Section 17205 provides: "All registered warrants are negotiable instruments."[15] However, registered warrants are not negotiable under the California Commercial Code, since they are not "payable on demand or at a definite time." Cal.Com.Code § 3104(c). The registered warrants plaintiffs received were not payable when financial institutions gave State employees value for them; instead, financial institutions bought the warrants to hold and collect the principal and interest when the State called the warrants for redemption.[16] The warrants were not "payable" until the State called them for payment because the word "payable" in this context means "the final act which extinguishes a negotiable instrument." 11 Am.Jur.2d, BILLS AND NOTES, § 963.

Under California law, registered warrants are more like investment securities than cash. They are "legal investments" for funds and for State agencies. Cal. Gov't.Code §§ 17202, 17204. The California Commercial Code defines a "certificated security" (as distinguished from a security not represented by an instrument) as:

a share, participation, or other interest in property or an enterprise of the issuer or *an obligation of the issuer* which is all of the following:

(i) Represented by an instrument issued in bearer or *registered* form.

(ii) Of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a *medium for investment.*

(iii) Either one of a class or series or by its terms divisible into a class or *series of* shares, participations, interests, or *obligations.*

Cal.Com.Code § 8102 (emphasis added). The registered warrants plaintiffs received were like certificated securities in that they represented an obligation of the issuer, were issued in registered form, and were bought and sold to some degree in a secondary market as a medium for investment. Paulus decl., defs.' Ex. 4, Ex. B–2, Broudy decl., defs.' Ex. 3, Ex. A–1 (Golden 1 Credit Union).

### 4. Relevant case law.

In *Fleming v. Pearson Hardwood Flooring*, 39 F.Supp. 300 (D.Tenn.1941), the court held that, "The minimum wage and overtime compensation prescribed by the [FLSA] must be paid to the employee in

---

**13.** Interagency Position on California Registered Warrants, dated June 30, 1992, by the Controller of the Currency, Federal Deposit Insurance Corporation, Federal Reserve Bank of San Francisco, and Office of Thrift Supervisor, Mulford decl., defs.' Ex. 6, Ex. C.

**14.** Defendants argue that federal regulators "explicitly authorized the use of registered warrants." Defs. opp. at 16. However, Federal regulators did not *authorize* the State to issue registered warrants; they were concerned with *regulating* the warrants once issued. Even if Federal regulators had authorized registered warrants, this would not determine whether de-

fendants violated the FLSA by paying plaintiffs' wages with registered warrants.

**15.** The Government Code also sets out procedures a taxpayer must follow to pay the taxpayer's State taxes with a registered warrant. Cal. Gov't.Code § 17280.1. There would arguably be no need for this statute if registered warrants were in fact cash or its equivalent.

**16.** Bank of America advised its depositors that, "A purchase occurs when a warrant is accepted for deposit ... or cashed." Paulus decl., defs.' Ex. 4, Ex. C–1.

cash or by negotiable instrument payable at par." *Id.* at 302–03.[17] The defendants in *Fleming* violated the FLSA by issuing "scrip," also called "certificates of indebtedness," which had no redemption date, was not negotiable at par, and was usually not redeemable at face value. *Id.* at 303.

The scrip at issue in *Fleming* and the registered warrants at issue here are distinguishable, but also similar. They are distinguishable in that registered warrants were redeemable with interest when called by the State; the *Fleming* scrip bore no interest. The interest on the warrants gave purchasers an incentive to pay face value; conversely, the lack of interest on the *Fleming* scrip gave purchasers an incentive to discount from face value. Hence, most warrants were purchased at face value, while the *Fleming* scrip was usually not purchased at face value. Further, the registered warrants were issued by a state government rather than a private company.

The registered warrants and the *Fleming* scrip are similar in that neither had a redemption date, and neither was freely negotiable. Additionally, plaintiffs' declarations and defendants' own exhibits reflect that some financial institutions charged a fee for negotiating the registered warrants, which is comparable to the discount from face value the *Fleming* court found unacceptable. Broudy decl., defs.' Ex. 3, Ex. A–2, Drake decl.

5. Negotiability in fact.

Defendants argue the fact the "overwhelming number of recipients of [registered warrants] have been able to negotiate them" shows their "general negotiability in fact." Defs.' opp. at 19. However, defendants do not dispute plaintiffs' declarations they were unable to negotiate their warrants or experienced difficulty in negotiating them.

Defendants also argue they are not responsible for financial institutions not freely negotiating registered warrants:

The fact that some institutions chose not to accept Registered Warrants in the first instance and others chose to not continue to accept them after initial acceptance, cannot be attributed to any conduct of [Defendants].... [Financial institutions' policies re registered warrants] can only be attributed to commercial decisions made for commercial purposes which cannot be attributed to actions of the State.

Defs. opp. at 17. However, defendants knew registered warrants would not be freely negotiated when they issued them and that federal banking regulators had advised banks and thrifts to exercise prudence in deciding whether and in what amount to invest in the warrants. Further, defendants could have foreseen that the situation would worsen as the budget impasse persisted.

Because of this limited negotiability, plaintiffs' wages were not paid "finally and unconditionally" or "free and clear" as 29 C.F.R. § 531.35 requires. The warrants were subject to conditions as issued and as negotiated. As issued, the warrants were subject to the condition that the State would not pay them until funds were available. As negotiated, the warrants were subject to conditions including transaction fees, membership in credit unions, existing bank accounts, or additional deposits. Broudy decl., defs. Ex. 3, Ex. A–2.

## IV.  CONCLUSION

The FLSA requires employers to pay statutory wages in cash or its equivalent. This requirement is applicable to the State, as an employer covered by the FLSA. Application of the requirement to the State does not violate the Tenth Amendment.

Registered warrants are not cash or its equivalent. Defendants faced difficult choices in view of the State budget impasse, the general fund cash shortfall, and case law requiring prompt payment under the FLSA. However, defendants' choice to

---

**17.** *Fleming* was decided before the regulations at issue were enacted, but it is consistent with those regulations.

pay State employees with registered warrants violated the FLSA. The market reality that most State employees were able to sell their warrants for face value, although relevant to whether defendants attempted in good faith to comply with the FLSA, does not make the registered warrants cash or its equivalent as the FLSA requires.

Plaintiffs' motion for partial summary judgment is granted.

IT IS SO ORDERED.