United States Court of Appeals
For the First Circuit

No. 92-2485

DANIEL J. GATELY, ET AL.,

Plaintiffs, Appellees,

v.

COMMONWEALTH OF MASSACHUSETTS, ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. A. David Mazzone, U.S. District Judge]

Before

Boudin, Circuit Judge,

Campbell, Senior Circuit Judge,

and Stahl, Circuit Judge.

Deborah S. Steenland, Assistant Attorney General, with whom Scott

Harshbarger, Attorney General and Thomas A. Barnico, Assistant

Attorney General, were on brief for appellants.
James B. Conroy, with whom Katherine L. Parks and Donnelly,

Conroy & Gelhaar, were on brief for appellees.

Paul D. Ramshaw, Donald R. Livingston, General Counsel, Gwendolyn

Young Reams, Associate General Counsel, and Vincent J. Blackwood,

Assistant General Counsel, on brief for the U.S. Equal Employment
Opportunity Commission, amicus curiae.

August 18, 1993

STAHL, Circuit Judge. This is an appeal from a

preliminary injunction issued pursuant to the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621 et

seq., prohibiting defendants-appellants Commonwealth of

Massachusetts, Thomas Rapone, Secretary of Public Safety, and

Francis McCauley, Executive Director of the Massachusetts

Retirement Board, from enforcing the statutorily mandated

retirement of members of the Department of State Police aged

55 or older. For the reasons set forth below, we affirm.

I.

Factual Background

In December 1991, the Massachusetts legislature

enacted 1991 Mass. Acts ch. 412 (effective July 1, 1992),

which called for, inter alia, the consolidation of the

Commonwealth's largest police force, the Division of State

Police, with its three smaller forces, the Metropolitan

District Commission Police ("MDC"), the Registry of Motor

Vehicles Law Enforcement Division ("Registry"), and the

Capitol Police. The newly consolidated police force is

referred to as the "Department of State Police."1

Prior to the consolidation, officers of the MDC,

Registry, and Capitol Police were subject to a mandatory

retirement age of 65, and officers of the Division of State

1. For purposes of clarity, however, throughout this opinion
we refer to the new Department of State Police as the
"Consolidated Department."

-2-
2

Police were subject to a mandatory retirement age of 50.

Section 122 of Chapter 412 repealed those mandatory

retirement ages and declared that all members of the

Consolidated Department who reach their fifty-fifth birthday

on or before December 31, 1992, shall retire by that date.

On December 21, 1992, ten days before the effective

date of the new mandatory retirement age, plaintiffs, members

of the former MDC and Registry divisions,2 commenced this

action seeking injunctive relief on the grounds that the new

mandatory retirement age violated the ADEA. See 29 U.S.C.

623(a)(1). On December 30, 1992, after a hearing that same

date, the district court issued an order granting plaintiffs'

motion for preliminary injunctive relief. See Gately v.

Massachusetts, 811 F. Supp. 26 (D. Mass. 1992). This appeal

followed.

II.

The Preliminary Injunction Standard

In deciding whether to grant a preliminary

injunction, a district court must weigh the following four

factors: (1) the likelihood of the movant's success on the

merits; (2) the potential for irreparable harm to the movant;

(3) a balancing of the relevant equities, i.e., "the hardship

to the nonmovant if the restrainer issues as contrasted with

2. The complaint lists 45 officers, 30 of whom reached the
age of 55 or older on December 31, 1992.

-3-
3

the hardship to the movant if interim relief is withheld,"

Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st

Cir. 1991); and (4) the effect on the public interest of a

grant or denial of the injunction. See, e.g., id. However,

the "sine qua non of [the preliminary injunction standard] is

whether the plaintiffs are likely to succeed on the merits."

Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993). See

also United Steelworkers of America v. Textron, Inc., 836

F.2d 6, 7 (1st Cir. 1987) ("The heart of the matter is

whether `the harm caused plaintiff without the injunction, in

light of the plaintiff's likelihood of eventual success on

the merits, outweighs the harm the injunction will cause

defendants.'") (quoting Vargas-Figueroa v. Saldana, 826 F.2d

160, 162 (1st Cir. 1987) (emphasis in original)).

A party appealing a grant of a preliminary

injunction bears the heavy burden of showing that the

district court either committed a mistake of law or abused

its discretion. Guilbert, 934 F.2d at 5. See also K-Mart

Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir.

1989) ("Decisions as to granting or withholding injunctive

redress can best be made by trial courts steeped in the

nuances of a case and mindful of the texture and scent of the

evidence."). Without such a showing, we will not disturb the

ruling below. Id.

-4-
4

Here, the district court weighed the four criteria

recited above and held that the scales tipped in favor of an

injunction. See Gately, 811 F. Supp. at 27-31. Although the

court admitted that the evidence relative to the second,

third, and fourth criteria was not markedly in either party's

favor, it found that plaintiffs would likely succeed on the

merits. Id. at 31. Accordingly, it issued the requested

preliminary injunction.

On appeal, defendants generally challenge the

court's application of all four criteria. Having reviewed

the district court's opinion, however, it is clear to us that

appellate elaboration is warranted only as to the first and

second criteria. We therefore adopt the district court's

cogent and well-reasoned opinion insofar as it relates to the

other two prongs of the preliminary injunction test and focus

on whether the court correctly presaged (a) plaintiffs'

likelihood of success at trial, and (b) the potential for

irreparable harm to plaintiffs in the absence of an

injunction.

III.

Discussion

A. Plaintiffs' Likelihood of Success

Under the ADEA, it is "unlawful for an employer . .

. to fail or refuse to hire or to discharge any individual or

otherwise discriminate against any individual . . . because

-5-
5

of such individual's age . . . ." 29 U.S.C. 623(a)(1).

The ADEA contains an "escape clause," however, which allows

employers some limited flexibility to take age into

consideration in business decisions. Commonly referred to as

the "BFOQ exception," the clause allows employers "to take

any action otherwise prohibited under [the statute] . . .

where age is a bona fide occupational qualification

reasonably necessary to the normal operation of a particular

business . . . ." 29 U.S.C. 623(f)(1). As noted by the

Supreme Court, this clause is "`an extremely narrow exception

to the general prohibition' of age discrimination contained

in the ADEA." Western Air Lines, Inc. v. Criswell, 472 U.S.

400, 412 (1985) (quoting Dothard v. Rawlinson, 433 U.S. 321,

334 (1977)).

In Criswell, the Court enunciated a two-pronged

test for courts to use in discerning the width of the

"extremely narrow" BFOQ exception. Id. at 412-20 (adopting

the two-part test outlined in Usery v. Tamiami Trail Tours,

Inc., 531 F.2d 224, 235-36 (5th Cir. 1976)). Under the first

prong, the employer must be able to show that the

qualification at issue is "reasonably necessary to the

essence of [its] business . . . ." Criswell, 472 U.S. at 413

(quoting Usery, 531 F.2d at 236) (emphasis in original); EEOC

v. City of East Providence, 798 F.2d 524, 528 (1st Cir. 1986)

(quoting Criswell). The second prong requires that the

-6-
6

employer justify its use of age as a proxy for that

qualification. Criswell, 472 U.S. at 414; City of East

Providence, 798 F.2d at 528. Justification can be

accomplished in one of two ways. The employer can show that

it "`had reasonable cause to believe, that is, a factual

basis for believing, that all or substantially all persons

over the age qualification[] would be unable to perform . . .

the duties of the job involved.'" Criswell, 472 U.S. at 414

(quoting Usery, 531 F.2d at 235) (emphasis added).

Alternatively, the employer can establish that "it is

`impossible or highly impractical' to deal with the older

employees on an individualized basis." Criswell, 472 U.S. at

414 (quoting Usery, 531 F.2d at 235).

As support for their contention that the district

court erred in determining plaintiffs' likelihood of success

under the ADEA, defendants make the following two arguments:

(1) controlling precedent in this circuit forecloses

plaintiffs' claims, see EEOC v. Trabucco, 791 F.2d 1 (1st

Cir. 1986) ("Trabucco II"); Mahoney v. Trabucco, 738 F.2d 35

(1st Cir.), cert. denied, 469 U.S. 1036 (1984) ("Trabucco

I"); and (2) plaintiffs' claims are barred by a 1986

amendment to the ADEA. See 29 U.S.C. 623(j). We address

each argument in turn.

1. Trabucco I and II

-7-
7

Defendants first contend that plaintiffs' challenge

to chapter 412 is precluded by the doctrine of stare decisis.

In so doing, they rely upon a case in which we upheld a lower

court's finding that the Massachusetts State Police's

statutorily mandated retirement age of 50 was a BFOQ, see

Trabucco I, 738 F.2d at 37-42, and a case in which we

subsequently reaffirmed Trabucco I on stare decisis

principles. See Trabucco II, 791 F.2d at 2-5. Defendants'

reliance upon these cases is misplaced.

The doctrine of stare decisis renders the ruling of

law in a case binding in future cases before the same court

or other courts owing obedience to the decision. "[U]nlike

the doctrines of res judicata and collateral estoppel, [the

doctrine of stare decisis] is not narrowly confined to

parties and privies, and it does not draw its force from the

policy protecting final judgments." Trabucco II, 791 F.2d at

2. "Rather, when its application is deemed appropriate, the

doctrine is broad in impact, reaching strangers to the

earlier litigation." Id.

The essential principles of stare decisis may be

described as follows:

(1) an issue of law must have been heard
and decided; (2) if an issue is not
argued, or though argued is ignored by
the court, or is reserved, the decision
does not constitute a precedent to be
followed; (3) a decision is stare decisis

despite the contention that the court was
not properly instructed by counsel on the

-8-
8

legislative history, or that the argument
was otherwise insufficient; (4) a
decision may properly be overruled if
seriously out of keeping with
contemporary views or passed by in the
development of the law or proved to be
unworkable; and (5) there is a heavy
presumption that settled issues of law
will not be reexamined.

Trabucco II, 791 F.2d at 4 (internal quotations and citations

omitted). Fidelity to this principle promotes "stability,

predictability, and respect for judicial authority." Hilton

v. South Carolina Pub. Rys. Comm'n, 112 S. Ct. 560, 564

(1991).

As stare decisis is concerned with rules of law,

however, a decision dependent upon its underlying facts is

not necessarily controlling precedent as to a subsequent

analysis of the same question on different facts and a

different record. Complaint of Tug Helen B. Moran, Inc., 607

F.2d 1029, 1031 (2d Cir. 1979). Cf. Gavin v. Chernoff 546

F.2d 457, 458-59 (1st Cir. 1976) (invoking stare decisis to

follow earlier opinion where "appellants' essential arguments

remain much the same as those considered and [previously]

rejected[, and] [t]here are no compelling new reasons and no

change in circumstances justifying reconsideration of the

previous decision") (internal quotation marks omitted).

A brief examination of the two cases relied upon by

defendants reveals the inapplicability of the doctrine here.

In Trabucco I, the district court had held that Mass. Gen. L.

-9-
9

ch. 32, 26(3)(a), which mandated retirement at age 50 for

the Division of State Police, while a valid BFOQ for the

Division generally, violated the ADEA as applied to the

plaintiff, a state trooper who had a desk job. We reversed,

holding that the age qualification applied to all members of

the state police, regardless of whether they had field or

desk jobs. Trabucco I, 738 F.2d at 39 (phrase "`occupational

qualification' means more of a recognized and discrete

vocation rather than a desk assignment for an employee

subject to all the obligations and benefits of a quasi-

military organization"). Our decision left intact, however,

the district court's finding that age 50 was a BFOQ for the

Division of State Police. Id. at 37.

After the district court ruling, but before our

reversal, the EEOC brought an action challenging the very

same mandatory retirement statute. The district court,

relying upon Trabucco I, held that the action was foreclosed

by principles of stare decisis. On appeal, the EEOC

contended that, because plaintiff Mahoney had offered no

evidence at trial to rebut the Commonwealth's BFOQ evidence,

the decision lacked precedential value. Trabucco II, 791

F.2d at 4. No facts had changed and the EEOC argued no new

law. It simply contended that it would offer the expert

testimony that had not been presented by plaintiff Mahoney.

Although recognizing the "non-absoluteness of stare decisis,"

-10-
10

id. at 4, we analyzed the proceedings below and found that

Mahoney raised and argued, and the district court decided,

the precise question of whether the across-the-board BFOQ was

valid. Id. at 4-5 ("Thus, the issue in the case at bar was

addressed by Mahoney in his litigation, even if not as

thoroughly as the EEOC would have desired."). As a result,

we rejected the EEOC's attempt to reopen that issue.

Trabucco II, 791 F.2d at 4-5 ("We have found no case, nor has

appellant cited us to any, that supports its contention that

a weak or ineffective presentation in a prior case deprives

the ruling of precedential effect.").3

There are two compelling reasons why these cases do

not foreclose the instant action. First, the question of

whether a mandatory retirement age is a BFOQ is a fact-

intensive inquiry. See Criswell, 472 U.S. at 417-23

(discussing the fact-based nature of the BFOQ defense);

Johnson v. Mayor & City Council of Baltimore, 472 U.S. 353,

362 (1985) (stressing the "particularized, factual showing"

3. In so doing, we observed that counsel for the EEOC

was not only aware of the [Trabucco I]

litigation, but could have intervened in
the district court or could have filed an
amicus brief on appeal. That it did
neither was attributed to its assessment
that the decision would not be given
stare decisis effect and to certain

practical problems, such as obtaining
expert witnesses.

Trabucco II, 791 F.2d at 4.

-11-
11

required by the ADEA of an employer claiming an age

qualification is a BFOQ); EEOC v. Boeing Co., 843 F.2d 1213,

1216 (1st Cir.) ("The validity of a BFOQ turns upon factual

findings, preferably ones by a jury."), cert. denied, 488

U.S. 889 (1988); Muniz Ramirez v. Puerto Rico Fire Servs.,

757 F.2d 1357, 1358 (1st Cir. 1985) ("We must reject

appellant's attempt . . . to have us rule as a matter of law

that an entry age of thirty-five for firefighters is a BFOQ.

A particular age limit for entry into a particular position

is a matter of proof."). See also Monroe v. United Air

Lines, Inc., 736 F.2d 394, 405 (7th Cir. 1984) ("a once-valid

BFOQ may lose its justification with advances in medical

science. That the age 60 rule may have been a BFOQ in 1978

does not place it beyond challenge [in 1983]"), cert. denied,

470 U.S. 1004 (1985). Here, the facts--as found by the

district court--differ from those underlying Trabucco I and

II in one crucial respect. In the instant case, plaintiffs

presented the district court with evidence, not available to

the plaintiffs in Trabucco I and II, suggesting that age is

not an effective proxy for determining an individual's

suitability to serve in a public safety job. See Frank J.

Landy et al., Alternatives to Chronological Age in

Determining Standards of Suitability for Public Safety Jobs

(January 31, 1992). And, as it made clear below, the

district court found this evidence persuasive. See Gately,

-12-
12

811 F. Supp. at 31 ("Here . . . the most thorough and

authoritative evidence presented states unequivocally that

currently available tests are more effective than age in

identifying officers who may be unable to perform the law

enforcement and public safety tasks required of them."). We

see no abuse of discretion in the district court's evaluation

of this evidence.

Second, not only are the underlying facts in this

case different from those present in Trabucco I and II, but

the legal landscape has been altered in critical respects as

well. In Trabucco I, which was decided prior to the Supreme

Court's most recent pronouncements on the ADEA, see supra pp.

6-7, this court applied a standard more lenient than that

subsequently adopted by the Supreme Court to determine--under

the first prong of the test--whether age was a BFOQ. In

Trabucco I, we held that an employer must show that the age

qualification is "reasonably related" to the operation of its

business. Trabucco I, 738 F.2d at 37. A year later, the

Supreme Court clarified that "[t]he BFOQ standard adopted in

the statute is one of `reasonable necessity,' not

reasonableness." Criswell, 472 U.S. at 419. See id. at 474

(explaining further that "age qualifications [must] be

something more than `convenient' or `reasonable'. . . .).

The Court also reiterated that "the BFOQ exception `was in

fact meant to be an extremely narrow exception to the general

-13-
13

prohibition' of age discrimination contained in the ADEA."

Id. at 412 (quoting Dothard, 433 U.S. at 334). Further, in a

case issued the same day as Criswell, the Court elaborated on

the evidentiary standard which must be met in these cases,

stressing that an employer must make a "particularized,

factual showing" that age is an effective proxy for the

qualification at issue. Johnson, 472 U.S. at 362

In light of Criswell and Johnson, we agree with the

district court's conclusion that Trabucco I, which was

decided under the more lenient "reasonable relation"

standard, and was based on less than the required

"particularized, factual showing," has been called into

question. See Gately, 811 F. Supp. at 30.

In sum, therefore, this case involves a different

set of facts, a newly crafted set of legal rules, and, as

such, legal issues of first impression for this court. As a

result, stare decisis does not provide a basis for avoiding a

trial on the merits.

2. The 1986 Amendment to the ADEA

Defendants next urge the application of 29 U.S.C.

623(j), a 1986 amendment to the ADEA which, they contend,

forecloses plaintiffs' claims. We disagree.4

4. Although the district court did not address the
applicability of this amendment, it is purely a matter of
statutory interpretation, and therefore a question of law
which we can review in the first instance. Cf. In re Erin

Food Servs., Inc., 980 F.2d 792, 799 (1st Cir. 1992).

-14-
14

The task of statutory interpretation begins with

the language of the statute, and statutory language must be

accorded its ordinary meaning. See, e.g., Telematics Int'l,

Inc. v. NEMLC Leasing Corp., 967 F.2d 703, 706 (1st Cir.

1992). Section 623(j) provides in relevant part:

Firefighters and law enforcement officers attaining
hiring or retiring age under State or local law on
March 3, 1983[.]

It shall not be unlawful for an employer
which is a State . . . to discharge any

individual because of such individual's
age if such action is taken --

(1) with respect to the employment of an
individual . . . as a law enforcement
officer and the individual has attained
the age of . . . retirement in effect
under applicable State or local law on
March 3, 1983, and

(2) pursuant to a bona fide . . .
retirement plan that is not a subterfuge
to evade the purposes of this chapter.5
5

This amendment, which took effect on January 1,

1987, and expires on December 31, 1993, gives states and

local officials a seven-year transition period within which

they can lawfully retire law enforcement officers pursuant to

5. The term "law enforcement officer" is defined as:

[A]n employee, the duties of whose
position are primarily the investigation,
apprehension, or detention of individuals
suspected or convicted of offenses
against the criminal laws of a State,
including an employee engaged in this
activity who is transferred to a
supervisory or administrative position. .
. .

-15-
15

a retirement plan in effect on March 3, 1983. It was on that

date that the Supreme Court decided, in the seminal case of

EEOC v. Wyoming, 460 U.S. 226 (1983), that the ADEA's

prohibition against mandatory retirement was applicable to

states and local governments.

According to defendants, this statute permits them

to apply Chapter 412 to plaintiffs because (a) Mass. Gen. L.

ch. 32, 26(3)(a), in effect on March 3, 1983, mandated

retirement at age 50 for the members of the former Division

of State Police; (b) although Chapter 32, 26(3)(a) was not

applicable to these specific plaintiffs on that date, it was

applicable to the members of the former Division of State

Police; and (c) the duties formerly assigned the Division of

State Police have now been assumed by the members of the

Consolidated Department. In effect, therefore, defendants

contend that 623(j) allows them to take a group of officers

who, in 1983, were subject to retirement at age 65, give them

a new title in 1992, and, in so doing, subtract 10 years from

their retirement age.

The plain meaning of the statutory language simply

does not support this result. Until its expiration on

December 31, 1993, the statute allows states to retire an

individual law enforcement officer on the basis of age if

"the individual has attained the age of . . . retirement in

effect under applicable state or local law on March 3, 1983 .

-16-
16

. . ." 29 U.S.C. 623(j)(1) (emphasis added). On March 3,

1983, the statute applicable to plaintiffs required them to

retire at age 65. Therefore, as plaintiffs have not

"attained the age of . . . retirement in effect under

applicable state or local law on March 3, 1983," 623(j)

does not give defendants the refuge they seek.

To be sure, the phraseology is not a model of

clarity. Yet, in their effort to read a loophole into

623(j), defendants ignore the word "individual," which

appears four times in the statute. When read as a whole, we

believe that the language compels the conclusion that the

word "applicable" means "applicable to the individual."6

Even if we were to construe the statute as being

ambiguous, however, we do not believe that defendants'

interpretation is consistent with the statute's purpose. As

explained by Senator Wendell Ford of Kentucky, one of the

primary architects of the final compromise version of this

statute, Congress intended 623(j) "to provide relief to

those jurisdictions which were forced to respond to [EEOC v.

Wyoming], while at the same time ensuring that no lesser

discrimination protection will be provided for these workers

than what was in effect at the time [EEOC v. Wyoming] was

6. We want to make clear, however, that we do not read
623(j)(1) as allowing those officers who may have elected to
transfer out of the MDC, Registry, or Capitol Police and into
the Division of State Police to claim the retirement age
applicable to them on March 3, 1983.

-17-
17

decided." 132 Cong. Rec. S16850-02 (daily ed. October 16,

1986) (emphasis added).

The statute, therefore, was enacted to give states

a grace period of seven years during which time certain

retirement plans for law enforcement officers would be

exempted from the ADEA's reach. Senator Ford explained that

the statute froze pre-existing age caps but did not exempt

from scrutiny stricter age caps subsequently enacted:

[T]his compromise establishes a floor for

the hiring and retirement requirements
which a State or local government can
set. The hiring and retirement age
requirements of a plan in effect as of
March 3, 1983 become the floor for

allowable plans. . . . If jurisdictions
have raised or eliminated mandatory
retirement ages after this date, they
have the choice of either moving back to
the plan requirements in effect on March
3, 1983, or remaining where they are.
However, States and local governments
would not be able to lower retirement age

requirements below what was [sic] in
effect as of March 3, 1983.

Id. (emphasis added).

Thus, in our view, neither the language of the

statute nor its legislative history supports the position

advanced by defendants. This statute was enacted to provide

an exception, limited in both purpose and duration, to the

ADEA's prohibition on mandatory retirement. The

Commonwealth's reliance upon this limited exception to

insulate from review its adoption of a new retirement policy

which subtracts ten years from the retirement age statutorily

-18-
18

applicable to plaintiffs on March 3, 1983, is therefore

misplaced.

In a last ditch attempt, however, to persuade us of

623(j)'s applicability, defendants alternatively argue that

the statute is ambiguous, and, as such, any ambiguity must be

resolved in the Commonwealth's favor. In support of their

position, defendants cite Gregory v. Ashcroft, 111 S. Ct.

2395 (1991), in which the Supreme Court held that the ADEA

did not preempt a state constitutional provision mandating

the retirement of state judges at age 70. Id. at 2408

(construing the "policymaking" exception in 630(f)). In

that case, the Court reasoned that state judges are among

those "`officers who participate directly in the formulation,

execution, or review of broad public policy [and thus]

perform functions that go to the heart of representative

government.'" Id. at 2402 (quoting Sugarman v. Dougall, 413

U.S. 634, 647 (1973)). The power of the people of a state to

"determine the qualifications of their most important

government officials" is, the Court held, fundamental to our

federalist system. Id. Thus, courts should not, according

to Gregory, construe federal statutes to infringe on that

power unless Congress expresses its intent to do so in the

plainest terms. Id. at 2401-03. Finding the text of

630(f) ambiguous on the question of whether Congress intended

to exempt state judges, the Court applied the "plain

-19-
19

statement" rule, reasoning that "[i]n the face of such

ambiguity, we will not attribute to Congress an intent to

intrude on state governmental functions . . . ." Id. at

2406.

We have recently discussed the limited scope of the

Court's holding in Gregory. See EEOC v. Massachusetts, 987

F.2d 64, 67-70 (1st Cir. 1993). In that case, we reversed

the district court's decision, based on its reading of

Gregory, that the ADEA did not preempt a state statute

requiring annual medical examinations for its employees at

age seventy. We reasoned that, although the Gregory court

was "unwavering in its desire to protect state sovereignty

and principles of federalism," it made "unequivocally clear .

. . the narrowness of its holding." EEOC v. Massachusetts,

987 F.2d at 68, 69 ("At no point did the Court suggest that

all state regulations of public employees are questions at

the heart of state sovereignty.").

We likewise reject defendants' argument that

Gregory's "plain statement" rule bars plaintiffs' cause of

action. As discussed above, we find no ambiguities in the

text of 623(j) which give us pause as to its applicability

here. See Gregory, 111 S. Ct. at 2406 (explaining that

"plain statement" rule is "a rule of statutory construction

to be applied where statutory intent is ambiguous"). See

also Hilton, 112 S. Ct. at 566 (reiterating the same).

-20-
20

Moreover, unlike the statutory exemption at issue in Gregory,

623(j) makes plain Congress' intent that the ADEA protect

law enforcement officers from forced retirement in cases

where the retirement plan at issue is more restrictive than

that in effect on March 3, 1983, or is a "subterfuge to evade

the purposes" of the ADEA.

In any event, we think defendants give Gregory far

too broad a reading. Plaintiffs, unlike the state judges at

issue in Gregory, are not "constitutional officers" who

"participate directly in the formulation, execution, or

review of broad public policy . . . ." Gregory, 111 S. Ct.

at 2401-02. Thus, the Court's concern with federal

infringement of a core function going to the "heart of

representative government" is not present here. For these

reasons, therefore, we decline to apply Gregory in the manner

urged by defendants.

Accordingly, we find no abuse of discretion or

mistake of law in the district court's conclusion that there

was a likelihood that plaintiff would succeed on the merits.

We turn now to the question of irreparable harm.

B. The Potential for Irreparable Harm

Defendants also contend that plaintiffs failed to

make the requisite showing of irreparable harm, and that the

district court, therefore, abused its discretion in granting

plaintiffs' motion for injunctive relief. In so doing,

-21-
21

defendants rely principally upon Sampson v. Murray, 415 U.S.

61 (1974), which they assert forecloses plaintiffs' claims.

Because this court has not yet had occasion to engage in a

detailed analysis of Sampson, and this case calls for a

careful reading of the opinion, we begin with a discussion of

that case.

In Sampson, the Supreme Court held that a

probationary federal employee, who sought to enjoin her

dismissal from employment pending an administrative appeal to

the Civil Service Commission ("CSC"), had to make a

particularly strong showing of irreparable harm to obtain

preliminary relief. Sampson, 415 U.S. at 91-92. The

critical facts are as follows. Upon her dismissal from the

defendant government agency, the plaintiff filed an

administrative appeal with the CSC, alleging that the agency,

in dismissing her, had failed to follow applicable federal

regulations. Subsequently, she filed an action in federal

district court seeking reinstatement while her administrative

appeal was pending. In her complaint, she alleged that the

dismissal would deprive her of income and cause her to suffer

the embarrassment of being wrongfully discharged. Finding

that plaintiff might suffer irreparable harm before the CSC

could consider her claim, the district court granted the

injunction, and the Court of Appeals affirmed. Id. at 66-67.

The Supreme Court reversed, concluding that the harm

-22-
22

plaintiff alleged she would suffer was not irreparable. Id.

at 91-92.

The questions presented on appeal were twofold: (1)

whether the district court had authority to issue the

injunction, and (2) if so, whether the injunction was

warranted. The Court stated early in its opinion that the

two questions were analytically related and could not be

neatly "bifurcated." Id. at 68. Accordingly, discussion of

the one makes little sense in the absence of any mention of

the other.

Although the Court ultimately answered the first

question in the affirmative, it did so only after noting the

multiple factors which weighed against a finding that the

district court had authority to award the injunction at

issue. Those factors included: (1) the fact that plaintiff

was seeking relief prior to having exhausted her

administrative remedies, and the concomitant "disruptive

effect which the grant of the temporary relief . . . was

likely to have on the administrative process," id. at 83; (2)

the lack of any express statutory basis for the injunction;

(3) the absence of any case law supporting this particular

injunction; (4) "the well-established rule that the

Government has traditionally been granted the widest latitude

in the dispatch of its own internal affairs," id. at 83

(internal quotations omitted); and (5) the fact that

-23-
23

plaintiff was a probationary employee entitled to few

procedural rights under the relevant regulations, id. at 81-

82. Despite these considerations, however, the Court

conceded the district court's limited authority to issue an

injunction in this type of case, stating that it was "not

prepared to conclude that Congress in this class of cases has

wholly divested the district courts of their customary

authority to grant temporary injunctive relief . . . ." Id.

at 80 (emphasis added).

Importantly, the Court then admonished district

judges that, although the factors listed above did not render

them "wholly bereft of the authority" to grant injunctive

relief "in this class of cases," they could not exercise that

authority "without regard to those factors." Id. Indeed,

the Court declared that those factors "are entitled to great

weight in the equitable balancing process which attends the

grant of injunctive relief." Id.

Before turning to the dispositive second question,

i.e., whether injunctive relief was warranted, the Court

again reiterated the close analytical relationship between

the first and second questions:

Although we do not hold that Congress has
wholly foreclosed the granting of
preliminary injunctive relief in such
cases, we do believe that [plaintiff] at
the very least must make a showing of
irreparable injury sufficient in kind and
degree to override these factors cutting
against the general availability of

-24-
24

preliminary injunctions in Government
personnel cases.

Id. at 84.

In analyzing the second question, the Court first

noted the complete absence in the record, with the exception

of certain statements in plaintiff's unverified complaint, of

any evidence of irreparable harm. Id. at 89-91. The Court

of Appeals had held that, at that stage of the proceedings,

the district court did not need to find that plaintiff was

actually irreparably harmed, and that, in any event,

plaintiff's allegations afforded a basis for such a finding.

The Court disagreed on both counts.

First, the Court stated unequivocally that

irreparable harm is a critical element of any injunctive

relief in federal court. Id. at 88. Second, the Court

explained that plaintiff's allegations of temporary loss of

income and harm to reputation did not amount to a sufficient

showing of irreparable harm. Even under traditional

standards, according to the Court, temporary loss of income,

which can be recouped at the end of a trial, "does not

usually constitute irreparable injury." Id. at 90.7

7. This premise had particular force in a Civil Service
case, the Court explained, because of the Back Pay Act, 5
U.S.C. 5596(b)(1), which provides a wrongfully discharged
Civil Service employee with full payment and benefits for the
time period she was out of work. The Court noted that the
Act's legislative history suggested that "Congress
contemplated that it would be the usual, if not the
exclusive, remedy for wrongful discharge." Id. at 90-91.

-25-
25

As for plaintiff's allegations of harm to

reputation, the Court found them unpersuasive. It was

difficult to imagine, according to the Court, how the

agency's failure to follow proper procedures in effectuating

her discharge could cause harm to plaintiff's reputation,

especially where any damage could be undone by an

administrative determination in her favor.

The Court assumed, however, for the purposes of its

opinion, that plaintiff had made a satisfactory showing of

financial and reputational hardship, and then held that such

a showing "falls far short of the type of injury which is a

necessary predicate to the issuance of a temporary injunction

in this type of case." Id. at 91-92. In a footnote

following this holding, the Court provided the following

caveat:

We recognize that cases may arise in
which the circumstances surrounding an
employee's discharge, together with the
resultant effect on the employee, may so
far depart from the normal situation that
irreparable injury might be found. Such
extraordinary cases are difficult to
define in advance of their occurrence.
We have held that an insufficiency of
savings or difficulties in immediately
obtaining other employment--external
factors common to most discharged
employees and not attributable to any
unusual actions relating to the discharge
itself--will not support a finding of
irreparable injury, however severely they
may affect a particular individual. But
we do not wish to be understood as
foreclosing relief in the genuinely
extraordinary situation. Use of the

-26-
26

court's injunctive power, however, when
discharge of probationary employees is an
issue, should be reserved for that
situation rather than employed in the
routine case.

Id. at 92 n.68 (citing Wettre v. Hague, 74 F. Supp. 396 (D.

Mass. 1947), vacated and remanded on other grounds, 168 F.2d

825 (1st Cir. 1948)).

As we read Sampson, it teaches that a federal court

cannot dispense with the irreparable harm requirement in

affording injunctive relief; that temporary loss of income

does not rise to the level of irreparable harm in the usual

employee discharge case, see, e.g., Levesque v. Maine, 587

F.2d 78, 81 (1st Cir. 1978) (citing Sampson and holding that

plaintiff's "possible loss of earnings" did not amount to

irreparable harm); and that, before enjoining a government

agency from dismissing a Civil Service employee who has not

exhausted her administrative remedies, a district court must

find that the facts underlying the employee's allegations of

irreparable harm are "genuinely extraordinary." E.g.,

Soldevila v. Secretary of Agriculture, 512 F.2d 427, 429-30

(1st Cir. 1975). Sampson also stands for the general

principle that irreparable harm is subject to a sliding scale

analysis, such that the showing of irreparable harm required

of a plaintiff increases in the presence of factors,

including the failure to exhaust administrative remedies,

which cut against a court's traditional authority to issue

-27-
27

equitable relief. See Chilcott v. Orr, 747 F.2d 29, 31-32

(1st Cir. 1984) ("In view of the strong judicial policy

against interfering with the internal affairs of the armed

forces, we will apply the more stringent test of Sampson to

applications for preliminary injunctions by military

personnel."); Bailey v. Delta Air Lines, Inc., 722 F.2d 942,

944 (1st Cir. 1983) ("Here, as in Sampson, we think that the

procedural requirements of Title VII should be considered in

the equitable balancing process [and that] an aggrieved

person seeking preliminary relief outside the statutory

scheme for alleged Title VII violations would have to make a

showing of irreparable injury sufficient in kind and degree

to justify the disruption of the prescribed administrative

process . . . .").

In interpreting Sampson, however, numerous other

courts have assumed that the "genuinely extraordinary" test

for irreparable harm applies in all employee discharge cases,

whatever the asserted basis for relief. See, e.g., Stewart

v. United States Immigration & Naturalization Serv., 762 F.2d

193, 199-200 (2d Cir. 1985); E.E.O.C. v. Anchor Hocking

Corp., 666 F.2d 1037, 1040-44 (6th Cir. 1981). But see

E.E.O.C. v. Cosmair, Inc., 821 F.2d 1085, 1090 (5th Cir.

1987) (holding that irreparable harm is presumed where

discharged employee has exhausted her administrative remedies

and proceeds under a civil rights statute).

-28-
28

Such a conclusion is predicated, in our opinion,

upon an overly broad, and faulty, interpretation of Sampson's

holding.8 As the Court itself made clear early in its

opinion, the questions of whether the district court had

authority to issue the injunction and whether the irreparable

harm finding was proper were not analytically distinct.

Sampson, 415 U.S. at 68. The Court reiterated throughout the

opinion that the district court should not have weighed the

irreparable harm allegations without taking into account the

multiple factors rendering tenuous its authority to reinstate

a discharged Civil Service employee pending the exhaustion of

the administrative appeal process. See supra p. 23. Before

leaving the question of the district court's authority, the

Court explained that the plaintiff "must make a showing of

irreparable injury sufficient in kind and degree to override

these factors . . . ." Id. at 84 (emphasis added). As such,

the Court's conclusion that an extraordinary showing of

8. In those cases in which we have applied Sampson's

heightened standard, we have relied upon the plaintiff's
failure to exhaust available administrative remedies. See

Chilcott, 747 F.2d at 31-33 (plaintiff airman sought

injunction without seeking relief before appropriate Air
Force administrative boards); Bailey, 722 F.2d at 943-45

(plaintiff sought injunction prior to exhausting Title VII
remedies); Soldevila, 512 F.2d at 429-30 (plaintiff civil

servant sought injunction prior to exhausting CSC appeals
process). Thus, the precise question of Sampson's

applicability where a plaintiff has no administrative
remedies to exhaust is one of first impression in this
circuit.

-29-
29

irreparable harm was required to override those factors was

hardly surprising.

Needless to say, those factors are not present in

all employee discharge cases. And, it makes little sense, in

our opinion, to require a district court to weigh all

discharged employees' requests for injunctive relief as if

they applied. Nothing in Sampson suggests that result.

Rather, the Court repeatedly referred to the fact-bound

nature of its holding. For instance, the Court stated that

the plaintiff's showing "falls far short of the type of

injury which is a necessary predicate to the issuance of a

temporary injunction in this type of case." Id. at 91-92.

And, in the footnote immediately following this holding, the

Court stated that "[u]se of a court's injunctive power . . .,

when discharge of probationary employees is an issue, should

be reserved for [the genuinely extraordinary] situation . . .

."9

The case before us differs from Sampson in several

significant respects: (1) plaintiffs are not seeking interim

injunctive relief pending the completion of an administrative

9. As support for this holding, the Court cited Wettre, 74

F. Supp. at 396, which, like the facts in Sampson, involved a

discharged civil servant who sought a temporary injunction
pending the completion of the administrative appeals process.
The Wettre court presciently held that, under the

circumstances, the complainants' allegations of loss of pay
and prestige did not amount to irreparable harm. Wettre, 74

F. Supp. at 400-01.

-30-
30

appeals process; (2) the district court unquestionably had

the authority to issue the requested equitable relief, see 29

U.S.C. 626(b), (c); (3) plaintiffs' allegations of

irreparable harm go beyond temporary loss of pay or

reputational injury; and (4) plaintiffs' are not claiming

that they are "entitled to additional procedural safeguards

in effectuating the discharge." See Sampson, 415 U.S. at 91.

Instead, they are arguing that their statutorily-based civil

rights will be violated in the event of their discharge.

Thus, all the factors which rendered the district court's

authority to issue the injunction so tenuous in Sampson--

factors which the court was required to take into

consideration in weighing the plaintiff's irreparable harm

allegations--are not present here. We do not think,

therefore, that these plaintiffs must meet the same exacting

standard required of the plaintiff in Sampson, although they

clearly must establish irreparable harm, and point to factors

sufficient to overcome "the traditional unwillingness of

courts of equity to enforce contracts for personal services."

Id. at 83.

The district court held below that plaintiffs had

made a sufficient, although not overwhelming, showing of

irreparable harm. See Gately, 811 F. Supp. at 27-28. The

Court rested its holding on two factual findings. First, the

Court found that reinstatement would not be an available

-31-
31

remedy for those plaintiffs who, at the close of a successful

trial on the merits, would have reached the new retirement

age, and, as a result of their earlier discharge, would lose

their twilight years of employment. Id. at 27. Second, the

Court was persuaded by plaintiffs' argument that, "time spent

away from the force [would] impair the plaintiffs' ability to

stay in touch with new developments, especially during this

time of transition, thus impairing their effectiveness and

that of the State Police as a whole[,] if and when they are

ultimately reinstated."10 Id. at 27.

Like the district court, we view the irreparable

harm question as a close call. The sole factor cutting

against the district court's authority to issue this

injunction is the wide latitude traditionally granted the

government in dispatching its own internal affairs. See

Sampson, 415 U.S. at 83. And, in accordance with Sampson's

teachings, the district court took this factor into

consideration before granting the injunction. Gately, 811 F.

Supp. at 28 (balancing the intrusion into internal

governmental affairs that would result from the injunction

with the harm to plaintiffs in the absence of it, and

concluding that any harm to defendants was minimal by

10. We recognize that the consolidation process had an
anticipated completion date of June 30, 1993. On the basis
of this record, however, we have no way of determining
whether the process has, in fact, been completed.

-32-
32

comparison). Ultimately, the district court balanced the

equities and determined that, particularly in light of

plaintiffs' high probability of succeeding on the merits, an

injunction was warranted.

Mindful of the broad discretion afforded a district

court in weighing irreparable harm, see K-Mart Corp., 875

F.2d at 915 (quoting Wagner v. Taylor, 836 F.2d 566, 575-76

(D.C. Cir. 1987)), we cannot say that the district court

erred in concluding that, under the circumstances, plaintiffs

made a sufficient showing of irreparable harm. Accordingly,

we affirm the district court's ruling.

IV.

Conclusion

In sum, we find the challenges leveled at the

district court's issuance of the preliminary injunction

unpersuasive. Accordingly, we affirm the district court's

decision. Affirmed. Costs to appellees.
Affirmed. Costs to appellees.

-33-
33